In re ENRON CORPORATION
SECURITIES, DERIVATIVE
& "ERISA" LITIGATION

Mark Newby, et al., Plaintiffs

v.

Enron Corporation, et al., Defendants

The Regents of the University of California, et al., Individually and On Behalf of All Others Similarly Situated, Plaintiffs,

v.

Kenneth L. Lay, et al., Defendants.

No. MDL–1446, CIV.A. H–01–3624.

United States District Court,
S.D. Texas,
Houston Division.

March 29, 2004.

Richard J. Zook, Tom Alan Cunningham, Cunningham Darlow et al, Roger B. Greenberg, Schwartz, Junell et al, G. Paul Howes, Milberg, Weiss et al, Earnest W. Wotring, Connelly, Baker et al, Charles R. Parker, Locke, Liddell and Sapp, Thomas W. Sankey, Sankey & Luck, Thomas E. Bilek, Hoeffner & Bilek LLP, Jack Edward McGehee, McGehee & Pianelli, Ronald Joseph Kormanik, Sydow, Kormanik et al, Gregory Sean Jez, Fleming & Associates, Robin L. Harrison, Campbell, Harrison et al, Herbert Blake Tartt, Jr., Allyson L. Mihalick, Beirne, Maynard et al, Jack Edward McGehee, Joseph Albert McDermott, III, Attorney at Law, Houston, TX, William S. Lerach, Keith F. Park, Helen J. Hodges, John A. Lowther, James I. Jaconette, Alexandra S. Bernay, Milberg, Weiss et al, San Diego, CA, Ira M. Press, Attorney at Law, Richard A. Speirs, Jeffrey C. Zwerling, Zwerling, Schachter et al, Robert B. Weintraub, Daniel W. Krasner, Wolf, Haldenstein et al, Stephen D. Oestreich, Entwistle & Cappuci LLP, Robert M. Kornreich, Robert C. Finkel, Wolf, Popper LLP, Jonathan M. Plasse, Goodkind, Labaton et al, New York, NY, Michael I. Behn, Futterman & Howard Chtd, Chicago, IL, James M. Finberg, Richard M. Heimann, Melanie M. Piech, Elizabeth Cabraser, Lieff Cabraser et al, Paul F. Bennett, Gold Bennett et al, San Francisco, CA, Stephen Lowey, Neil L. Selinger, Lowey Dannenberg et al, White Plains, NY, Sherrie Savett, Arthur Stock, Berger & Montague, PC, Deborah R. Gross, Law Offices Bernard M. Bross, PC, Philadelphia, PA, William B. Federman, Federman & Sherwood, Oklahoma City, OK, Martin D. Chitwood, Jeffrey H. Konis, Edward H. Nicholson, Jr., Chitwood & Harley, Atlanta, GA, Sidney S. Liebesman, Jay W. Eisenhofer, Grant & Eisenhofer PA, Wilmington, DE, David C. Mattax, Office of Attorney General, Rose Ann Reeser, Texas Attorney General, Austin, TX, James F. Marshall, Attorney at Law, San Marino, CA, Meredith Cavallo, Larry E. Klayman, Judicial Watch Inc., Steven J. Toll, Cohen,

Milstein et al, Washington, DC, Todd Wayne Hutton, Judicial Watch Inc., Theodore C. Anderson, Kilgore & Kilgore, PLLC, Dallas, TX, David R. Scott, Neil Rothstein, James E. Miller, Scott & Scott LLC, Colchester, CT, Hector G. Gancedo, Gancedo & Nieves LLP, Pasadena, CA, Thomas G. Shapiro, Shapiro Haber et al, Boston, MA, David B. Kahn, Attorney at Law, Northfield, IL, for plaintiffs.

Robin D. Hosea, Seabrook, TX, pro se.

Stephen D. Susman, Kenneth S. Marks, Susman, Godfrey, LLP, Scott David Lassetter, John B. Strasburger, Weil, Gotshal & Manges, Craig Smyser, Jr., Smyser, Kaplan & Veselka, Robin C. Gibbs, Gibbs & Bruns, Ronald Gene Woods, Attorney at Law, Russell "Rusty" Hardin, Jr., Rusty Hardin and Associates, Barry G. Flynn, Attorney at Law, Billy Jack Shepherd, George W. Billy Shepherd, III, Cruse Scott et al, Clayton C. Cannon, Stumpf, Craddock et al, Mark K. Glasser, King & Spalding, Charles G King, III, King & Pennington, LLP, Lawrence David Finder, Barry Abrams, Abrams, Scott et al, William H. Knull, III, Mark Daniel Manela, Mayer, Brown et al, Joel M. Androphy, Berg & Androphy, Taylor M. Hicks, Jr., Hicks, Thomas et al, Richard Warren Mithoff, Jr., Mithoff and Jacks, Eric J. R. Nichols, Beck, Redden & Secrest, Joseph D. Jamail, II, Jamail and Kolius, Ronald Earl Cook, Cook & Roach LLP, Jack C. Nickens, Nickens Keeton et al, David Elliott Miller, Hugh R. Whiting, Jones Day, William Edward Matthews, Gardere Wynne et al, Harvey G. Brown, Jr., Wright & Brown, Matthew D. Shaffer, Schechter McElwee et al, R. Paul Yetter, Yetter and Warden, Houston, TX, Richard Bruce Drubel, Jr., Boies, Schiller et al, Hanover, NH, John W. Keker, Jan Nielsen Little, Christa M. Anderson, Kerker & Van Nest, LLP, Peter Wald, Matthew D. Harrison, Gabriel G. Gregg, Latham &

Watkins, LLP, Stan G. Roman, Krieg, Keller et al, Kelly M. Klaus, Ronald L. Olson, Dennis C. Brown, John W. Spiegel, Kristin L. Myles, Munger, Tolles, & Olson, LLP, San Francisco, CA, Julia B. Cooper, Walston, Wells et al, N. Lee Cooper, Maynard Cooper et al, Crawford S. McGivaren, Jr., Cabaniss Johnston et al, Robert K. Spotswood, Attorney at Law, Kenneth D. Sansom, Spotswood, LLC, Warren B. Lightfoot, Lightfoot, Franklin et al, James C. Huckaby, Jr., Huckaby, Scott et al, Birmingham, AL, James E. Coleman, Jr., Carrington Coleman et al, Charles A. Gall, Jenkens & Gilchrist, Dallas, TX, Charles F. Richards, Jr, Richards, Layton et al, Wilmington, DE, David Clarke, Jr., Keara M. Gordon, Piper, Mabury et al, Robert M. Stern, Bruce Hiler, O'Melveny, Myers, LLP, Turner P. Smith, Samuel Rosenthal, Curtis Mallet-Prevost et al, Michael D. Warden, Luisa Caro, Sidley, Austin et al, John K. Villa, Mary G. Clark, George A. Borden, Robert A. Van Kirk, Gilbert O. Greenman, Williams & Connolly, LLP, Scott B. Schreiber, John C. Massaro, Justin S. Antonipillai, Arnold & Porter, Stephen J. Crimmins, Kara L. Haberbush, Pepper Hamilton LLP, Antonia Apps, Attorney at Law, David Schwarz, Reid M. Figel, Kellogg Huber et al, Lauren Ouziel, Paul Weiss et al, Washington, DC, Brenda M. Hamilton, Glenn E. Coe, Rome McGuigan et al, William J. Melley, III, Attorney at Law, Michael Joseph Walsh, Moukawsher & Walsh, Hartford, CT, David Carr Greer, Bieser, Greer et al, Dayton, OH, Joseph C. Espy, III, Melton, Espy et al, Alvin L. Fox, Jr., Maynard Cooper et al, Montgomery, AL, Joseph F. Welborn, III, Walker, Bryant et al, Salvador M. Hernandez, Bowen, Riley et al, Nashville, TN, Jeffrey Kilduff, O'Melveny & Myers, McLean, VA, Daniel F. Kolb, Sharon Katz, Sharon Katz, Davis, Polk et al, Theresa Ann Foudy, Benard V. Preziosi, Myles Bartley, Eliot

Lauer, Myles Bartley, Curtis Mallett-Prevost et al, Catherine E. Palmer, Christopher R. Harris, Seth L. Friedman, Latham & Watkins, Gregory A. Markel, Gregory G. Ballard, Ronit Setton, Nancy I. Ruskin, Jason M. Halper, Cadwalader, Wickersham et al, Richard W. Clary, Karin A. DeMasi, Margaret K. Dooley, Rachel G. Skaistis, Julie Ann North, Melissa J. Baily, Joseph R. Wallin, Richard W. Clary, Cravath, Swaine et al, New York, NY, David H. Braff, Steven J. Purcell, Adam R. Brebner, Jeffrey T. Scott, Michael T. Tomaino, Jr., Julian C. Swearengin, Sullivan & Cromwell LLP, Lawrence Byrne, Owen Pell, Johanna S. Wilson, Lance Croffoot-Suede, Timothy Pfeifer, White & Case LLP, Christopher M. Joralemon, Herbert S. Washer, James B. Weidner, James D. Miller, Ignatius Grande, James F. Moyle, Guy C. Quinlan, James N. Benedict, Mark A. Kirsch, Jason A. D'Angelo, James D. Miller, Clifford Chance US LLP, Robert F. Serio, Gibson, Dunn & Crutcher, Marshall R. King, James L. Hallowell, Marshall R. King, Gibson Dunn et al, John D. Roesser, David J. Woll, Simpson, Jonathan K. Youngwood, David J. Woll, Jonathan K. Youngwood, Thacher & Bartlett, Thomas C. Rice, Bruce D. Angiolillo, Christopher M. Caparelli, Jill M. O'Toole, George S. Wang, William M. Tong, Nihara K. Choudhri, Pieter H. B. Van Tol, Bruce D. Angiolillo, Mary Elizabeth McGarry, Thomas C. Rice, Bruce D. Angiolillo, Mary Elizabeth McGarry, Simpson Thacher et al, Sean M. Murphy, Attorney at Law, Robert C. Micheletto, David L. Carden, Jones Day et al, Michael G. Davies, Hoguet Newman et al, David W. Woll, Attorney at Law, Robyn F. Tarnofsky, Jonathan Hurwitz, Michael E. Gertzman, Brad S. Karp, Erez Liebermann, Paul Weiss et al, New York, NY, Miles N. Ruthberg, Charles W. Cox, III, James NMI Ferrell, Ethan J. Brown, Camille N. Tragos, Latham & Watkins, Kevin S. Allred, Munger Tolles et al, Los Angeles, CA, Jeffrey S. Bagnell, Ethan A. Levin Epstein, Garrison, Levin, Epstein et al, Anthony M. Fitzgerald, Carmody & Torrance, New Haven, CT, John Cooper McDonald, Schottenstein, Zox et al, William Chester Wilkinson, Thompson Hine, LLP, John Wolcott Zeiger, Zeiger & Carpenter, Mark Kingsley Merkle, Jr., Porter Wright et al, Fordham Eric Huffman, Jones Day et al, Columbus, OH, J. Daniel Sagarin, Hurwitz, Sagarin, Milford, CT, Paul R. Bessette, Akin, Gump et al, Austin, TX, B. J. Rothbaum, Ryan S. Wilson, Drew Neville, Charles E. Geister, III, Hartzog, Conger et al, Kurt M. Rupert, Attorney at Law, Oklahoma City, OK, Alan N. Salpeter, Mayer, Brown & Platt, Jordan M. Rudnick, Mark McLaughlin, Andrew D. Campbell, Michele L. Odorizzi, Mayer, Brown et al, Alan S. Madans, Rothschild, Barry et al, Avidan J. Stern, Jenner Block LLC, Keith Carter Hannigan, Jenkins & Gilchrist, Charles B. Leuin, Attorney at Law, Chicago, IL, Marc J. Kurzman, Madeleine F. Grossman, Levett Rockwood PC, Westport, CT, Timothy K. Roake, Gibson Dunn et al, Palo Alto, CA, Mark S. Gregory, Kelley Drye et al, Stamford, CT, Elizabeth T. Parker, Matthew R. Skolnik, Pepper Hamilton LLP, Philadelphia, PA, Brian A. Troyer, Jones Day et al, Cleveland, OH, for defendants.

HARMON, District Judge.

## ROADMAP
### *MEMORANDUM AND ORDER*
### *RE MERRILL LYNCH AND DEUTSCHE BANK ENTITIES*

I.  Merrill Lynch ...................................................827

    A.  Motion for Clarification ............................................827
    B.  Motion to Dismiss Exchange Act Claims ................................827
        1.  Primary Violator ............................................827
        2.  Loss Causation .............................................830

II.  Deutsche Bank Entities ..................................................832
    A.  Summary of Allegations and Arguments ................................832
        1.  Exchange Act Claims ........................................832
        2.  1933 Act Claims ............................................839
    B.  Court's Rulings .....................................................843
        1.  Exchange Act Claims ........................................843
            (a)  Pleading Sufficiency ...................................843
            (b)  Statute of Limitations .................................843
                 (i)   Sarbanes–Oxley Act .........................844
                 (ii)   Continuing Violation Theory ................844
                 (iii)  Period of Repose and Tax Scheme Claims ....................848
                 (iv)  Relation Back and Equitable Tolling/Estoppel Doctrines ........849
        2.  1933 Act's § 12(a)(2) and § 15 Claims ...............................859
            (a)  Standing ..............................................859
            (b)  Private or Public Offerings .............................859

III.  Order ................................................................866

## MEMORANDUM AND ORDER

With respect to Lead Plaintiff's initial Consolidated Complaint (instrument # 441),[1] in the Court's memorandum and order, entered on December 20, 2002 (# 1194), the Court granted Deutsche Bank AG's first motion to dismiss all claims against it. The Court also found that Lead Plaintiff had not met the pleading requirements imposed by the PSLRA[2] in its allegations against Merrill Lynch & Co., but denied Merrill Lynch's motion to dismiss and ordered Lead Plaintiff to amend its pleadings to address with adequate particularity the Nigerian barge transaction and/or the transactions with Enron North America involving a complex set of bogus power trades in the Midwest, both of which fit the pattern of fraud previously pleaded by Lead Plaintiff. Both transactions occurred in 1999.

After the Court had resolved all motions to dismiss the First Consolidated Complaint, on May 14, 2003 Lead Plaintiff filed its First Amended Consolidated Complaint (# 1388), with amended allegations against Merrill Lynch & Co. and claims against newly added Merrill Lynch, Pierce, Fenner and Smith (collectively, "Merrill Lynch").[3] The First Amended Consolidated Complaint also asserted claims against Deutsche Bank AG once again, but added as new Defendants Deutsche Bank Securities, Inc., DB Alex. Brown LLC, and Deutsche Bank Trust Company Americas (collectively "the Deutsche Bank Enti-

---

1. The original *Newby* complaint (# 1) was filed on October 22, 2001. After appointment by the Court, Lead Plaintiff filed the First Consolidated Complaint for Violation of the Securities Laws ("the *Newby* Complaint") on April 8, 2002. # 441. The latest, controlling Amended Consolidated Complaint for Violation of the Securities Laws (# 1388) was filed on May 14, 2003.

2. Private Securities Litigation Reform Act of 1995, which amended both the Securities Act of 1933 and the Securities Exchange Act of 1934. 15 U.S.C. § 78u–4.

3. The new complaint identifies Merrill Lynch, Pierce, Fenner & Smith as the agent of, and an entity controlled by, its parent company, Merrill Lynch and Co., Inc.

ties").[4]

With respect to all these Defendants, pending before the Court in the above referenced cause are Merrill Lynch's motion to dismiss the amended complaint (# 1499); Merrill Lynch's motion for clarification of the Court's June 27, 2003 order concerning the PSLRA stay (# 1556); and the Deutsche Bank Entities' motion to dismiss (# 1620).

Against Merrill Lynch, the First Amended Consolidated complaint asserts claims for violation of § 10(b), 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, and for control person liability under § 20(a), 15 U.S.C. § 78t(a), of the Securities Exchange Act of 1934 ("the 1934 Act").

The amended complaint also charges the three "surviving" Deutsche Bank Entities (Deutsche Bank AG, Deutsche Bank Securities Inc., and Deutsche Bank Trust Company) with violations of § 10(b) and § 20(a) of the Securities Exchange Act of 1934 and Rule 10b–5. It further asserts that Deutsche Bank AG and Deutsche Bank Securities Inc. f/k/a Deutsche Banc Alex. Brown violated § 12(a)(2)[5] and § 15[6] of the Securities Act of 1933 ("the 1933 Act").

---

**4.** According to the First Amended Consolidated Complaint, Deutsche Bank AG controlled Deutsche Bank Securities Inc. (successor of Deutsche Bank Alex. Brown LLC), DB Alex. Brown LLC (a wholly owned subsidiary of Deutsche Bank Securities Inc.), and Deutsche Bank Trust Company Americas (a wholly owned subsidiary of Deutsche Bank AG).

With a supporting affidavit and documents (Exs. 1–2 to # 1621), Deutsche Bank Entities in the Memorandum of Law in support of their motion to dismiss, # 1621 at 1, nn. 1 and 2, state that as "a matter of public record,"

... [O]n or about June 4, 1999, Tanus Corporation, a subsidiary of Deutsche Bank AG, merged with Bankers Trust Corporation, owner of 100% of the common stock of Bankers Trust Americas ... [and][o]n or about April 25, 2003 Bankers Trust Corporation changed its name to Deutsche Bank Trust Company Americas....

[O]n or about December 3, 1999, BT Alex. Brown Incorporated converted into a Delaware limited liability company named DB Alex. Brown, LLC.... On or about January 12, 2001, [Deutsche Banc Securities Inc. ("DBSI")] merged with and into DB Alex. Brown LLC.... DBSI was the surviving company and changed its name to Deutsche Bank Alex. Brown Inc.... On or about March 29, 2002, Deutsche Bank Alex. Brown Inc. changed its name to Deutsche Bank Securities Inc. Therefore, neither DB Alex. Brown LLC nor Deutsche Bank Alex. Brown Inc. are legal entities capable of being sued as entities distinct from DBSI.

**5.** Section 12(a)(2) of the 1933 Act, 15 U.S.C. § 77*l*(a)(2), formerly designated Section 12(2), provides that a purchaser of a security may bring a private action against a seller that "offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of material fact or omits to state a material fact necessary in order to make the statements ... not misleading."

According to the First Amended Consolidated Complaint at 127, ¶ 107(b), Deutsche Bank Securities Inc.

under the control of Deutsche bank AG ... acted as an underwriter of certain Enron and Enron affiliated entity securities, including: the Enron Credit Linked Notes Trust 8/17/00 8% Enron Credit Linked Notes due 05; the Osprey Trust, Osprey I, Inc. 9/28/00 7.797% and 6.375% Senior Secured Notes due 1/15/03; Enron's 2/01 sale (and 7/01 resale) Zero Coupon Convertible Senior Notes due 21; the Osprey Trust, Osprey I, Inc. 9/23/99 8.31% Senior Secured Notes due 03; and the Marlin Water Trust II, Marlin Water Corp. II 7/12/01 6.31% and 6.19% Senior Secured Notes due 03.

**6.** Section 15 makes liable "[e]very person who, by or through stock ownership, agency, or otherwise, ... controls any person liable" under Sections 11 or 12 of the 1933 Act. 15 U.S.C. § 77*o*.

## I. Merrill Lynch

### A. Motion for Clarification

As a threshold matter, the Court grants Merrill Lynch's motion for clarification. The Court concurs that because the Court has not yet ruled that Lead Plaintiff has adequately stated a claim against Merrill Lynch or the Deutsche Bank Entities, the discovery stay under the Private Securities Litigation Reform Act ("PSLRA") is still in effect as to these Defendants. Accordingly, the Court now reviews their motions to dismiss the claims against them in the First Amended Consolidated Complaint.

### B. Motion to Dismiss Exchange Act Claims against Merrill Lynch

The Court hereby incorporates into this memorandum and order the factual allegations and applicable law set out in the Court's previous memoranda and orders addressing motions to dismiss in *Newby*.

Merrill Lynch essentially makes two arguments in its motion to dismiss pursuant to Fed. Rules of Civil Procedure 12(b)(6) and 9(b): (1) that Lead Plaintiff has not and cannot allege facts showing that Merrill Lynch was a primary violator of § 10(b) and Rule 10b–5; and (2) that Lead Plaintiff has failed to allege loss causation arising from the challenged Nigerian barge transaction and the power swaps in 1999, as required under § 10(b) and Rule 10b–5.

### 1. Primary Violator

■ First, insisting that Lead Plaintiff has failed to plead a primary violation of the securities laws by Merrill Lynch, Merrill Lynch argues that the allegations only amount to, if anything, mere aiding and abetting of securities fraud, not cognizable as a primary violation of § 10(b) and Rule 10b–5. Merrill Lynch points to a recent complaint (Ex. B to Declaration of Stephen M. Loftin (# 1500)) filed by the SEC against Merrill Lynch and four of its former employees charging them only with aiding and abetting securities fraud violations. Merrill Lynch maintains that Lead Plaintiff's claims are barred by the Supreme Court's decision in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994).[7]

Furthermore Merrill Lynch contends that it had no special business relationship with Enron or its shareholders regarding the transactions at issue, that Merrill Lynch did not create, structure or direct any purported misstatements, and that any injury suffered by plaintiffs was caused by **Enron's** alleged misstatements about its financial status. In the same vein Merrill Lynch insists that it never directed or contrived the Nigerian barge investment nor the power swaps in 1999, which it maintains were merely normal business deals with nothing illegal involved, that it never engaged in a manipulative or deceptive act, and that it never participated in recording these challenged transactions in

---

**7.** In *Central Bank*, the Supreme Court held that a **private** plaintiff may not maintain an aiding and abetting action under § 10(b). The SEC is authorized under § 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), to bring enforcement actions for equitable relief and seek monetary penalties against those who aid and abet violations of § 10(b); moreover section 104 of the PSLRA, amended 15 U.S.C. § 78t to authorize SEC injunctive actions for aiding and abetting of violators, thereby "re-

vers[ing] any impact *Central Bank* might have had on the SEC's power to enjoin the aiding and abetting of these securities provisions.". *U.S. S.E.C. v. Fehn*, 97 F.3d 1276, 1282–83 (9th Cir.1996), *cert. denied*, 522 U.S. 813, 118 S.Ct. 59, 139 L.Ed.2d 22 (1997). The fact that the SEC is authorized to and has charged Merrill Lynch merely with aiding and abetting does not automatically mean that Lead Plaintiff cannot assert a claim that Merrill Lynch is a primary violator of § 10(b).

Enron's books or reviewing the correctness of Enron's accounting. Indeed, Merrill Lynch argues that the transactions targeted in the complaint did not directly affect the market for Enron securities until after Enron's purported misrepresentations of them.[8]

Quoting *In re Homestore.com, Inc. Sec. Litig.*, 252 F.Supp.2d 1018, 1040 (C.D.Cal. 2003) as its authority, Merrill Lynch insists it cannot be charged as a primary violator of § 10(b):

> [O]f the many participants in a "scheme," there may be primary violators and secondary violators. Those who actually "employ" the scheme to defraud investors are primary violators, while those who merely participate in or facilitate the scheme are secondary violators. In the present case, the primary architects of the scheme are the officers of Homestore who designed and carried out the schemes to defraud. The Court holds that other actors, such as AOL and its employees who actively participated in the triangular transaction scheme, did not "employ" the scheme to defraud investors, and are therefore secondary violators. Therefore, they are "aiders and abettors" within the meaning to *Central Bank*.

Merrill Lynch urges that if there was a scheme to defraud, Enron alone is responsible because it designed the transactions, employed the scheme, and misrepresented its financial situation.

Second, Merrill Lynch contends that Lead Plaintiff has failed to allege loss causation, a requisite element for a claim under § 10(b). Merrill Lynch argues that because the Nigerian barge transaction and the power swaps were not known to the public until April and August of 2002,[9] respectively, five and nine months after the Class Period ended on November 27, 2001, and long after the price of Enron securities had collapsed, Lead Plaintiff cannot plead or prove that the plaintiffs' losses were caused by these two transactions, nor that any conduct by Merrill Lynch caused plaintiffs any pecuniary loss. Loss causation is an element of a claim under § 10(b), 15 U.S.C. § 78u–4(b)(4) ("In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages."). *See Huddleston v. Herman & MacLean*, 640 F.2d 534, 549 (5th Cir.1981), *aff'd in part, rev'd in part on other grounds*, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). Instead, insists Merrill Lynch, actions contrived and directed by and misrepresentations made by Enron, not Merrill Lynch, caused the Plaintiffs' alleged injury, if any.

**8.** In a footnote relating to the addition of Merrill Lynch, Pierce, Fenner and Smith ("MLPF & S") in the amended complaint, Merrill Lynch joins the other banks in asserting that the claims against any newly added entities related to the original named Defendants is barred by the statute of limitations because the amended consolidated complaint was filed more than a year after discovery of the facts constituting the alleged misconduct and does not relate back to the original consolidated complaint because Lead Plaintiff has not shown any "mistake" about the identity of the correct party. The Court will address that argument when it deals with the Deutsche Bank Entities' motion to dismiss, since the issue was raised in, briefed, and argued in detail in the body of its and other banking Defendants' motions, unlike in Merrill Lynch's footnote.

**9.** Merrill Lynch represents that the Nigerian barge transaction was first reported in *The Wall Street Journal* on April 9, 2002, while the power swaps were disclosed by *The New York Times* on August 8, 2002. Loftin Decl. (# 1500), Exs. C & D.

In acknowledging the wide spectrum of judicial opinions regarding § 10(b) and Rule 10b–5, this Court has rejected the narrow construction of the statute and of primary violations employed by *Homestore.com* and refers the parties to its extensive discussion in # 1194. Moreover, as explained in that memorandum and order, a misrepresentation need not have been made because the statute also applies to conduct,[10] here the alleged substantial, active role in major fraudulent transactions with no legitimate business purpose, but designed to deceive investors in and central to a scheme and course of business operating to present a falsely inflated image of Enron's financial strength.

■ After reviewing the First Amended Consolidated Complaint and all submissions relating to Merrill Lynch's motion to dismiss (# 1499), i.e., # 1500, 1501, 1574, 1575, 1601, 1617, 1685, and 1720, the Court finds that Lead Plaintiff has adequately stated a claim with particularity, giving rise to a strong inference of scienter, against Merrill Lynch under §§ 10(b) and 20(a) of the 1934 Act.

Lead Plaintiff has alleged with specificity that Merrill Lynch "directly or indirectly" employed a scheme to defraud and engaged in acts, practices, and a course of business over the Class Period, as well as issued numerous analysts' reports and recommendations containing false and misleading statements about Enron's financial condition, as part of the purported Ponzi scheme that was intended to and did operate as a fraud or deceit upon investors in connection with the purchase of Enron securities, including the plaintiff class. Lead Plaintiff's new and specific allegations regarding the Merrill Lynch's deceptive conduct in the Nigerian barge deal (purchasing Nigerian barges from Enron to create sham earnings of over $12 million in return for a secret, oral side agreement with Andrew Fastow that Enron would repurchase them within six months so there would be no risk, but only a lucrative profit for Merrill Lynch). Moreover, Lead Plaintiff alleges that notes were written by and warnings made to Merrill Lynch's Commitment Committee by James Brown, head of Merrill Lynch's Structured Finance Group, reflecting concerns about the "reputational risk" of the deal,[11] as well as internal communications in the company. Such allegations support a strong inference that Merrill Lynch knew the Nigerian barge deal was a phony transaction created to manipulate Enron's income statements in return for Merrill Lynch's lucrative 15% return. Lead Plaintiff has also provided copies of a letter agreement between the Department of Justice/Enron Task Force and Merrill Lynch reflecting Merrill Lynch's acceptance of responsibility for the Nigerian barge transaction and cooperation with the government, and of the indictment of Merrill Lynch employees Daniel Bayly, James A. Brown and Robert S. Furst for their role in the transaction *inter alia.* # 1685. Exs. C & D.

In the same vein the alleged bogus future power swaps were from incomplete

---

10. The allegations of nondisclosure of vital information materially affecting the market price of Enron's securities support application of the rebuttable fraud-on-the-market theory of reliance. Leaving aside the allegations of misrepresentations about Enron made by Merrill Lynch analysts, the Court observes that this doctrine, which is recognized in the Fifth Circuit, suffices to establish reliance.

11. Merrill Lynch puts the phrase in context by providing the full quotation from a copy of Brown's notes (Ex. A to Declaration of Stephen M. Loftin (# 1500)): "reputational risk with aid/abet Enron income stmt. manipulation." The Court observes that Mr. Brown's characterization of the transaction is not a legal conclusion binding on the Court.

power plant construction projects, incapable of producing energy (again with a clandestine agreement to cancel the transactions after Enron's 1999 earnings report) and no energy ever changed hands. In addition the complaint points out that Merrill Lynch sought and obtained a statement from Enron's Chief Accounting Officer, Richard Causey, that Enron had not relied on Merrill Lynch for account advice regarding these transactions.

All these facts constituted conduct purportedly designed to mislead potential investors and the market generally about Enron's financial integrity. Although Merrill Lynch argues its actions were not unlawful and that they were merely business transactions later misrepresented by Enron in its financial statements, the factual allegations suggest knowingly deceptive conduct, concealed for unlawful purpose(s), which included misleading Enron investors whose money was needed to perpetuate the Ponzi scheme and Merrill Lynch's "money tree." Sham business transactions with no legitimate business purpose that are actually guaranteed "loans" employed to inflate Enron financial image are not above-board business practices. This Court disagrees with Merrill Lynch's contention that the alleged " 'deception' did not occur until Enron allegedly misreported" the transactions. # 1501 at 16.

These newly alleged transactions are not to be viewed in isolation. Lead Plaintiff's complaint has alleged an ongoing scheme in which Merrill Lynch participated in a substantial way over years. Not only do the particularities of alleged Nigerian barge deal, which purportedly was approved by top executives on Merrill Lynch's Commitment Committee despite warnings from James Brown, and the power swaps in 1999 imply deception of Wall Street and the public at large by Merrill Lynch and give rise to a strong inference of scienter, they also cast a long shadow over Merrill Lynch's ongoing, substantial participation in the alleged Ponzi scheme. Merrill Lynch purportedly actively engaged in the scheme to defraud not only in 1999, but from early in the Class Period when it participated in establishing and funding LJM2 at a critical accounting time, despite red flags identified in the complaint and known to Merrill Lynch. Its participation resulted in dubiously enormous financial returns for Merrill Lynch officers who personally invested in it, as well as lucrative earnings for the company. The concealed pattern of manipulation (including unlawful SPEs, off-the-books transactions without any legitimate economic purpose to inflate Enron's earnings and conceal its debts, sham hedging, guaranteed "loans" or disguised sales, etc.,) that characterized the alleged Ponzi scheme, repeated in the Nigerian barge and sham power swaps transactions, created a highly inaccurate public picture of Enron's financial condition; the success of the alleged deceptive scheme, buttressed by purported misrepresentations about Enron in Defendants' analysts' reports and recommendations, attracted investors and caused their loss when the bubble burst and the fraudulent scheme was exposed. Indeed, when this Court ordered Lead Plaintiff to replead its claims against Merrill Lynch, it did so because the Nigerian barge transaction and the power swaps fit the pattern that the original consolidated complaint had alleged; such parallels imply a deliberate, unified scheme to defraud.

## 2. Loss Causation

▮ As for Merrill Lynch's causation challenge, there are two aspects of causation that must be alleged under § 10(b): transaction causation and loss causation. *Emergent Capital Investment Manage-*

*ment, LLC v. Stonepath Group, Inc.,* 343 F.3d 189, 196–97 (2d Cir.2003).

> Like reliance, transaction causation refers to the causal link between the defendant's misconduct and the plaintiff's decision to buy or sell securities.... It is established simply by showing that, but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction." ... Loss causation, by contrast, is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff... We have often compared loss causation to the tort law concept of proximate case, "meaning that the damages suffered by plaintiff must be a foreseeable consequence of any misrepresentation or material omission." .... Similar to loss causation, the proximate cause element of common law fraud requires that plaintiff adequately allege a causal connection between defendants' nondisclosures and the subsequent decline in the value of the [the] securities.... Of course, if the loss was caused by an intervening event, like a general fall in the price of Internet stocks, the chain of causation will not have been established. But such is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss. [citations omitted]

*Id.* at 197.[12] *See also Caremark Inc. v. Coram Healthcare Corp.,* 113 F.3d 645, 648 (7th Cir.1997) ("To plead transaction causation, the plaintiff must allege that it would not have invested in the instrument if the defendant had stated truthfully the material facts at the time of sale. To plead loss causation, the plaintiff must allege that it was the very facts about which the defendant lied which caused its injuries.").

■ In the Fifth Circuit, the plaintiff must prove loss causation by showing that "the untruth was in some reasonably direct, or proximate, way responsible for his loss. The causation requirement is satisfied in a Rule 10b–5 case only if the misrepresentation [or omission] touches upon the reasons for the investment's decline in value." *Huddleston,* 640 F.2d at 549; *see also Nathenson v. Zonagen, Inc.,* 267 F.3d 400, 413 n. 10 (5th Cir.2001) (defendants' actions need only "touch[ ] upon the reasons for the investment's decline in value."). In *Broudo v. Dura Pharmaceuticals, Inc.,* 339 F.3d 933, 938 (9th Cir.2003), *petition for cert. filed,* 72 U.S.L.W. 3451 (March 8,2004)(No. 03–932), the Ninth Circuit observed, "This 'touches upon' language is admittedly ambiguous.... Our cases have held ... that: '[i]n a fraud-on-the market case, plaintiffs establish loss causation if they have shown that the price *on the date of purchase* was inflated because of this misrepresentation.' ... [F]or a cause of action to accrue, it is not necessary that a disclosure and subsequent drop in the market price of the stock have actually occurred, because the injury occurs at the time of the transaction [emphasis in text; citations omitted]." *In accord, Gebhardt v. ConAgra Foods, Inc.,* 335 F.3d 824, 832 (8th Cir.2003) ("[P]laintiffs were harmed when they paid more for the stock than it was worth."); *Suez Equity Investors, L.P. v. Toronto–Dominion Bank,* 250 F.3d 87, 97–98 (2d Cir.2001) ("[P]laintiffs may allege ... loss causation by averring ... that the defendants' misrepresentations induced a disparity between the transaction price and the true 'investment quality' of the securities at the time of the transaction."). Indeed, the Seventh Circuit has pronounced that loss causation is a "practical requirement" that "ought not

---

**12.** There is no dispute about adequacy of allegations asserting transaction causation here.

place unrealistic burdens on the plaintiff at the initial pleading stage." *Caremark Inc. v. Coram Healthcare Corp.,* 113 F.3d 645, 649 (7th Cir.1997). "It does not require ... that the plaintiff plead that all of its loss can be attributed to the false statement of the defendant." *Id.*

■ Viewing the pleading in a light most favorable to Lead Plaintiff, the Court finds that the first amended consolidated complaint does allege the requisite loss causation between plaintiffs' alleged economic loss and the acts, misrepresentations, omissions, and/or concealment of the realities underlying the sham financial reports and image of success projected by Enron and co-Defendants. Not only does the complaint allege that the fraud artificially inflated the value of Enron securities, indeed of the corporation itself, but there is no showing that the plaintiffs' loss was the result of external market forces such as recession, a volatile market, a fall in prices in energy trading generally or any "intervening" factor. Instead the plaintiffs have adequately pleaded that their loss was directly and foreseeably caused by Defendants' alleged fraudulent practices at Enron, including Merrill Lynch's Nigerian barge transaction and bogus power trades involving Enron North America, the nonexistence of the reported influx of cash, and the all too real, increasing, but hidden, debt as Defendants' deceptive scheme allowed them to create the illusion of a growing and profitable company while grabbing high fees based on fraudulent business deals with no legitimate purpose other than to "cook the books" and appropriate money from deceived investors. Nonexposure of Enron's deceptive business practices and the concealment of its actual financial condition directly and foreseeably induced the plaintiffs to purchase the securities at a highly inflated price until the Ponzi scheme bubble inevitably broke. Once the fraud began to be disclosed, the swift drop in the market price of Enron securities reflected the real financial condition of this empty house of cards and revealed the disparity between the plaintiffs' purchase price and the actual value of the securities when they were bought. While information about Merrill Lynch's individual role in the Nigerian barge transaction and the sham power swaps may not have been made public until long after the Enron bankruptcy, that fact does not relieve Merrill Lynch of responsibility for Enron's collapse; Merrill Lynch's alleged substantial participation in the deceptive business practices contributed to the artificial inflation of the price of the securities and thereby was a direct and major cause of plaintiffs' financial loss, according to the amended complaint.

In sum, the Court denies Merrill Lynch's second motion to dismiss.

## II. Deutsche Bank Entities

The Court has similarly reviewed the Deutsche Bank Entities' motion to dismiss (# 1620) claims in the First Amended Consolidated Complaint, pursuant to Federal Rules of Civil Procedure 12(b), 9(b) and 15, against all three for violation of § 10(b) and § 20(a) (control person liability) of the 1934 Act and against Deutsche Bank Securities Inc. and Deutsche Bank AG for violations of § 12(a)(2) and § 15 (control person liability) of the 1933 Act. It has also reviewed related filings (# 1620, 1621, 1707, 1751, 1883, and 1887).

### A. Allegations and Arguments

#### 1. Exchange Act Claims

According to **general** allegations in Lead Plaintiff's new pleading, which were in large part previously asserted in the First Consolidated Complaint and dismissed as insufficient by the Court,

Deutsche Bank provided substantial commercial lending and banking and investment services to Enron, helped structure and finance LJM2 and advise on additional transactions that falsified the company's financial statements relating to that SPE, aided Enron in falsifying its financial statements and misrepresenting its financial condition to the public, and issued throughout the Class Period falsely positive securities analyst reports, including a number identified by date, about Enron's success and prospects for more.[13] Deutsche Bank also served as underwriter for billions of dollars of Enron and Enron-related securities, for which it allegedly issued false and misleading Registration Statements and Prospectuses (again based on Enron's inflated financial picture that the Deutsche Bank Entities purportedly played a major role in creating). The Court previously found that such allegations were insufficient to state a claim against Deutsche Bank, AG under § 10(b) and derivatively under § 20(a).

The new pleading, drawing on revelations in recent reports issued by Congressional investigators and Enron's Bankruptcy Examiner, Neal Batson, adds to previous charges new § 10(b) claims against Deutsche Bank as a primary violator based on six structured tax deals ("STDs"), i.e., fraudulent tax schemes knowingly devised, structured, promoted to Enron as a method to generate accounting income, and executed by Deutsche Bank and its Bankers Trust Division ("Bankers Trust"),[14] purportedly without a valid business purpose, but solely to mislead investors by fraudulently, materially, and artificially inflating Enron's financial results and allowing Enron to avoid paying federal income tax in 1996, 1997, 1998, 1999 and 2001.[15] The STDs allowed Enron to recognize present earnings from future speculative tax savings, in the words of Neal Batson's Third Report, App. G at 3–4, "in an erroneous and misleading manner as pre-tax income," without ever disclosing the origins of the earnings to investors or the IRS. According to the amended complaint, these STDs were in deliberate violation of the "business purpose" tax law, which requires that a transaction have a valid business purpose other than generating tax savings. The amended complaint at 531, ¶ 797.6, asserts that the flaunting of the "business purpose" rule

was included in the opinion letters documenting the Bankers Trust transactions. As put by John Buckley, chief tax counsel to the Democratic members of the Committee on Ways and Means and former chief of staff to the Joint Committee on Taxation: *"All of these transactions have no real business purpose, unless*

13. Lead Plaintiff claims that throughout the Class Period Deutsche Bank issued analyst reports, lauding the company's "monumental earnings potential over the next five years," accompanied by "Buy" recommendations, while knowingly concealing the fact that the bogus tax schemes created by Deutsche Bank, to be discussed, substantially contributed to Enron's falsely inflated financial results. See, e.g., # 1388, ¶¶ 131, 152 184, 210, 232, 237, 253, 257. The complaint further charges Deutsche Bank with misstatements and omissions in its boilerplate disclosure on its analyst reports, which failed to reveal conflicts of interest in its investments in LJM2, in offering documents as underwriter of Enron securi-

ties, incorporating Enron's false financial statements to which Deutsche Bank's STDs substantially contributed and that were subsequently restated.

14. Named Defendant Deutsche Bank Trust Company Americas, a wholly owned subsidiary of Deutsche Bank AG, is the successor of Bankers Trust Company.

15. According to the complaint, Bankruptcy Examiner Neil Batson estimated that Enron reported income of approximately $800 million from 1995–September 2001 based on these tax schemes.

*you believe it's to artificially create income to report to shareholders.*" Moreover these tax structures have been under investigation and negatively criticized by Congressional committees and Enron bankruptcy Examiner Neal Batson, as described in the amended complaint.[16] Lead Plaintiff argues, "Artificial inflation of financial results cannot reasonably be a valid business purpose under the federal income tax laws as written by Congress." #1707 at 17.

The complaint focuses on six of these tax transactions (Projects Steele, Teresa, Cochise, Tomas, Renegade and Valhalla[17]) in some detail. It alleges the basic functions of each, identifies specific amounts of money fraudulently infused into Enron's financial reports by each and the amounts earned by Deutsche Bank in creating and carrying out the projects, points to opinion letters from law firms relating to each Project and charges each scheme with an actual purpose of inflating Enron's financial reports, references tax and accounting standards that were purportedly violated, and explains how Bankers Trust functioned as a primary actor[18] in each scheme, without all of which the tax sav-

16. The Amended Complaint references the First (September 21, 2002) and Second (January 21, 2003) Interim Reports of Neal Batson and the 2,700–page Joint Committee on Taxation Report of Investigation of Enron Corporation and Related Entities Regarding Federal Tax and Compensation Issues, and Policy Recommendations ("the JCT Report"), which Lead Plaintiff has informed the Court is available at *www.house.gov/jct*, although it has attached copies of passages that it has cited to #1707, Ex. A.

The Deutsche Bank Entities also address the Third Interim Report of the Examiner. Moreover, they argue that the JCT Report did not deal with accounting or securities law issues and that it concluded that the structured tax transactions were proper and complied with the law, indeed "were designed to satisfy the literal requirements of the corporate tax laws" and "were predicated on the interaction of the corporate tax-free transfer rules and the basis rules that apply to such transfers." JCT Report at 9. Citing passages from these reports, Lead Plaintiff disputes Deutsche Bank Entities' characterizations of the substance of the documents and argues that it has pleaded very specifically the structure and *illegitimate* purpose of each project, the Deutsche Bank Entities' role, numerous GAAP violations, and the exact amount by which each STD inflated Enron's earnings with sufficient details to raise a strong inference that Defendants acted with scienter. Enron and Deutsche Bank are alleged to have agreed to conceal the STDs, with Deutsche Bank even inserting a contractual clause nul-

lifying Project Steele if it were ever disclosed. In its memorandum of law in opposition, Lead Plaintiff asserts that 20% of Enron's reported earnings were derived from these or similar tax transactions. #1707 at 21.

The Court observes that any conclusions in these reports are not binding and they do not relieve Lead Plaintiff of its obligation to plead facts supporting the elements of its claim with the requisite particularity.

17. The complaint states that the first four were devices designed to have no other purpose than to obtain favorable tax benefits and earnings income, while in the last two schemes Bankers Trust allegedly engaged in sham transactions with Enron to obtain favorable tax benefits. It also represents that although some of the transactions were created prior to the Class Period, they were structured to cause artificial inflation of income and tax savings in the future, during the Class Period.

18. For instance, with respect to Project Tomas, the complaint at 538, ¶ 797.27, quotes the JCT Report to demonstrate the essential role played by Bankers Trust:

To dispose of the leased assets with a stepped up basis without incurring tax, Enron formed a partnership with Bankers Trust, which in essence served as an accommodation party in the transaction. Without a willing though unrelated party to hold the leased assets through a partnership for at least two years before selling them off, the tax savings and financial statement

ings and financial statement benefits claimed would have been impossible.[19] The Amended Complaint at ¶ 797.5 identifies as the "investment bankers who were the architects for Bankers Trust/Deutsche Bank's tax wing in Enron's house of cards . . . largely former Andersen personnel, who had worked in its New York office," specifically Managing Director Thomas Finley, Vice Presidents Brian McGuire and William Boyle, and Manuel Schneidman. Moreover the complaint asserts that Bankers Trust "clearly knew that Enron's financial results were artificially inflated by these tax schemes—which is evident from the way each transaction was structured," as described in greater detail in the Complaint. For instance, with respect to Project Steele, the complaint alleges that not only did Bankers Trust "clearly know that a huge portion of Enron's reported financial income was from an undisclosed taxation scheme and not from ordinary business operations," but "Project Steele included an 'unusual provision nullifying the deal' if it had to be disclosed," obviously because if the IRS learned about the scheme, "it would almost certainly challenge the transaction."

The Deutsche Bank Entities argue that the fact they had presented the tax schemes to the Federal Reserve and the IRS for review undermines Lead Plaintiff's allegations that these transactions were fraudulent. In response, Lead Plaintiff's amended complaint, quoting Batson's reports and the Joint Committee on Taxation's Report ("JCT"), asserts that there "is no indication that the bank regulators ever reviewed or approved the proposed tax or accounting consequences of these structures," that much of the information was never seen by the IRS, that the IRS' review was very narrow and circumscribed, and that the schemes were so complex as to "raise[ ] serious concerns about the ability of the IRS to ever find out about these transactions." Obviously there are fact issues here that cannot be resolved at a motion-to-dismiss stage of the litigation, during which the Court views Lead Plaintiff's allegations as true.

The "surviving" Deutsche Bank Entities, i.e., Deutsche Bank AG, Deutsche Bank Trust Company Americas, and Deutsche Bank Securities Inc.,[20] have moved to dismiss the § 10(b) claim for failure to satisfy the heightened pleading standards of the PSLRA and Fed.R.Civ.P. 9(b), and for failure to plead with specificity the elements of such claim, including scienter as to each entity,[21] transaction causation (reliance, i.e., that the fraud precipitated the investment decision), and loss causation.

Lead Plaintiff responds that it has adequately pleaded reliance under the fraud-on-the-market doctrine, accepted by the Fifth Circuit, by pleading that the STDs "operated to present a falsely positive pic-

---

benefits claimed through the use of this structure would not have been possible.
The appreciated assets were subsequently sold without payment of taxes on the appreciation, but the earnings were booked.

19. Plaintiffs' Memorandum (# 1707 at 18) quotes the third Batson report, App. G at 3–4, concluding that Deutsche Bank "designed, promoted and participated" in the structured tax deal "while knowing that the transaction[s] served no substantial business purpose for Enron other than enabling Enron to report the potential benefit of speculative future tax deductions in an erroneous and misleading manner as pre-tax income."

20. See footnote 4.

21. Arguing that the complaint fails to distinguish among them, Deutsche Bank Entities point out that this Court has held that group pleading is "at odds with the PSLRA," which requires particularized pleading of scienter as to each Defendant. *Collmer v. U.S. Liquids, Inc.*, 268 F.Supp.2d 718, 755 (S.D.Tex.2003). They insist they are three separate legal entities.

ture of Enron's financial condition ... thereby artificially inflating the value of Enron's publicly traded securities" and that plaintiffs relied on these market prices. # 1707 at 26, citing # 1388 at ¶¶ 797, 799, 983–984. It has also asserted that Deutsche Bank made materially false and misleading statements or omissions in analyst reports and offering documents, on which plaintiffs relied. This Court concurs that Lead Plaintiff has adequately pleaded reliance under § 10(b).

Moreover, regarding loss causation,[22] Lead Plaintiff points out that while plaintiffs' damages were allegedly "caused by an assortment of conduct that violated § 10(b)," Deutsche Bank does not have to be "the *sole* reason for the artificial inflation and subsequent decline in Enron's share price," but according to the complaint was "a primary participant in the fraudulent scheme that caused plaintiffs' losses." # 1707 at 27–28, *citing Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 649 (7th Cir.1997)(Loss causation "does not require ... that the plaintiff plead that all of its loss can be attributed to the false statement of the defendant."). Given the light burden of pleading loss causation at this stage, discussed *supra*, the Court concurs that Lead Plaintiff has met that standard. *See Broudo v. Dura Pharmaceuticals, Inc.*, 339 F.3d at 938 (" '[i]n a fraud-on-the market case, plaintiffs establish loss causation if they have shown that the price *on the date of purchase* was inflated because of this misrepresentation.' ... [F]or a cause of action to accrue, it is not necessary that a disclosure and subsequent drop in the market price of the stock have actually occurred, be-

cause the injury occurs at the time of the transaction [emphasis in text; citations omitted]."); *Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 832 (8th Cir.2003) ("[P]laintiffs were harmed when they paid more for the stock than it was worth."); *Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d at 97–98 ("[P]laintiffs may allege ... loss causation by averring ... that the defendants' misrepresentations induced a disparity between the transaction price and the true 'investment quality' of the securities at the time of the transaction."). The Court finds that Lead Plaintiff has adequately alleged loss causation in asserting that the price of Enron's publicly traded securities were artificially inflated during the Class Period, when they purchased their Enron securities, in part because of the STDs, which did not provide Enron with any actual cash flow; Lead Plaintiff alleges that the STDs recorded at least on paper approximately $446 million income from 1997 and 2001, which affected the valuations of Enron securities. # 1388 at 532, ¶ 797.10.[23]

Deutsche Bank Defendants insist that the new allegations about the tax schemes do not set forth sufficient facts to demonstrate that they were fraudulent to satisfy Rule 9(b)'s particularity requirement; instead Lead Plaintiff relies on claimed summaries of the Bankruptcy Examiner's Second Reports and the JCT report. The Examiner's Third Report, insist Defendants, undermines the claim that the tax schemes were fraudulent by showing they were arm's length business transactions. In particular Deutsche Bank argues that

---

**22.** See pages 830–32 of this memorandum and order.

**23.** In its memorandum (# 1707 at 29), Lead Plaintiff reprints a graph taken from the *Washington Post* demonstrating the amount of

artificial inflation created by eleven Enron fraudulent tax transactions in 1997, 1998, 1999, and 2000 and stating that the six Deutsche Bank tax transactions "accounted for 69% of the total inflation to Enron's net income resulting from tax schemes."

Lead Plaintiff's new claims fail to meet the "creator test" adopted by this Court [24] because the complaint only asserts that the Deutsche Bank Entities engaged in customary, arm's-length business transactions in these tax structures.

Deutsche Bank Entities also insist that these new claims based on the tax schemes against all Deutsche Bank Entities are time-barred and that the § 10(b) claims now also asserted against Deutsche Bank Trust Company Americas and Deutsche Bank Securities Inc. do not "relate back" under Fed. R. of Civ. P. 15(c).[25]

Deutsche Bank Entities also maintain that *none of the § 10(b) claims meets the* particularity requirements for pleading and that the § 12(a)(2) claim fails because the First Amended Consolidated Complaint does not allege that the offering memoranda contained material misstatements or omissions and because the statute does not apply to private placements. Thus the complaint also fails to state a claim for derivative control person liability under § 20(a) of the 1934 Act and § 15 of the 1933 Act. *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 348 n. 123 (5th Cir.2002).

Deutsche Bank Entities point out that Project Teresa closed in March 1997, Steele in October 1997, Tomas in September 1998, Renegade in December 1998, Cochise in January 1999 and Valhalla in May 2000. ·They contend that the closing of each project triggered the period of repose. The Amended Consolidated Complaint was not filed until May 14, 2003, over three years after *Lampf's* three-year period of repose would have expired as to these projects. *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 364, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991)("Litigation instituted pursuant to § 10(b) and Rule 10b–5 ... must be commenced within one year after the discovery of the facts constituting the violation and within three years after such violation."). Moreover, Defendants contend, even if the Court should find that the STD claims "relate back" with respect to the newly added entities to the previous [First Consolidated] complaint, filed on April 8, 2002, the claims as to all Projects except Valhalla, which did not close until May 2000, would be time-barred by the three-year statute of repose period.

Furthermore, Defendants insist, the claims against newly added Defendants

---

**24.** As Lead Plaintiff points out, the creator test, discussed in # 1194, applies to the making of false or misleading statements, but not to allegations of a scheme under Rule 10b–5(a) and (c), 17 C.F.R. § 240.10b–5, as is also alleged here. # 1707 at 19. Lead Plaintiff has alleged that Deutsche Bank's overall conduct in Enron's Ponzi scheme makes it liable for its role and the damages it caused.

**25.** Rule 15(c), addressing "Relation Back of Amendments", provides in relevant part,

An amendment of a pleading relates back to the date of the original pleading when
(1) relation back is permitted by the law that provides the statute of limitations applicable to the action, or
(2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, or
(3) the amendment changes the party or the naming of the party against whom a claim is asserted if the foregoing provision (2) *is satisfied and within the period provided* by Rule 4(m) [with 120 days following the filing of the complaint] for service of the summons and complaint, the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known *that,* but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

Deutsche Bank Trust Company Americas and Deutsche Bank Securities Inc.[26] under § 10(b) and/or § 12(a)(2) had to have been, but were not, brought within one year of discovery. *Jensen v. Snellings,* 841 F.2d 600, 606 (5th Cir.1988)(Section 10(b) limitations period is triggered when plaintiffs have knowledge of "facts which, in the exercise of due diligence, would have led to actual knowledge [of the violation].") Section 13 of the 1933 Act, 15 U.S.C. § 77m, provides that a claim based on § 12(a)(2) must be commenced "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." *Topalian v. Ehrman,* 954 F.2d 1125, 1134–35 and n. 23 (5th Cir.1992), *cert. denied,* 506 U.S. 825, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992).

Indeed, the Deutsche Bank Entities argue that the complaint, itself, is the best evidence of the expiration of the statute of limitations for claims brought under all the statutes as to the newly added Defendants because it identifies October 16, 2001 as the date on which Enron disclosed $1 billion in charges and a reduction of shareholders' equity by $1.2 billion, followed by media disclosures, in turn followed by plaintiffs' filing of their first complaint in this securities fraud action on October 22, 2001; nevertheless, argue Deutsche Bank Entities, Plaintiffs waited until May 14, 2003, nineteen additional months after the first complaint was filed, to add Deutsche Bank Trust Company Americas and Deutsche Bank Securities, Inc.[27] They further contend that Plaintiffs chose not to take advantage of the eight-month period between the filing of their first consolidated complaint and the Court's December 2002 ruling on motions to dismiss, during which they could have amended as a matter of course pursuant to Fed.R.Civ.P. 15(a). They maintain that Plaintiffs were aware of the facts and circumstances surrounding the tax schemes by May 22, 2002, when the *Washington Post* published a detailed article about the very tax transactions named in the Amended Complaint. April Witt and Peter Behr, *Enron's Other Strategy: Taxes; Internal Papers Reveal How Complex Deals Boosted Profits by $1 Billion, Washington Post,* May 22, 2002, *republished,* 2002 WL 20711256. Another article was published in the *Washington Post* on January 21, 2003 about the STDS: Peter Behr and Carrie Johnson, *Enron Probes Now Focus on Tax Deals: Bankr.Examiner To File Report Today; Congressional Investigation Nears Completion,* now available at 2003 WL 2369941.

Furthermore, insist Deutsche Bank Defendants, there is no "relation back" applicable to the addition of Deutsche Bank Trust Company Americas and Deutsche Bank Securities Inc. in the First Amended Consolidated Complaint because the first consolidated complaint, at ¶¶ 83(i), 71, 107,

---

**26.** Deutsche Bank AG was initially sued in the First Consolidated Complaint, filed on April 8, 2002, under § 10(b) and § 20(a) of the Exchange Act of 1934 and Rule 10b–5. The Court granted its motion to dismiss those claims on December 19, 2002. The First Amended Consolidated Complaint, filed on May 14, 2003 once again named Deutsche Bank AG as a Defendant under the same statutes, but with the added STD claims. Lead Plaintiff further sued, for the first time, Deutsche Bank Trust Company Americas and Deutsche Bank Securities Inc. under § 10(b) and § 20(a), and Deutsche Bank Securities Inc. under § 12(a)(2) and 15 of the Securities Act of 1933.

**27.** The Court finds the argument that Plaintiffs were on inquiry notice of these complex, concealed tax schemes on October 16, 2001 meritless. Instead, it finds May 22, 2002, the date of publication of the first *Washington Post* article on the STDs as the date when a reasonably prudent person would have been put on notice.

and 648, mentioned that Deutsche Bank Trust Company Americas, formerly known as Bankers Trust Company, was part of Deutsche Bank and it referred to Deutsche Bank Alex. Brown, now known as Deutsche Bank Securities Inc. In sum, charge the Deutsche Bank Entities, "[P]laintiffs made a strategic decision not to name [Deutsche Bank Trust Company Americas and Deutsche Bank Securities, Inc.] in the Newby Complaint, not to add them as defendants as a matter of course prior to December 19, 2002, and not to request leave to amend as to either thereafter with respect to the [Six Structured Transactions]." #1621 at 10. They did not make a mistake about the identity of these two entities.

Deutsche Bank Entities also maintain that the challenged tax transactions were legitimate and were designed to comply with the tax laws and accounting standards (GAAP), as even critics agree. Moreover, they contend, the bankruptcy Examiner concluded that Valhalla was beneficial to Enron and did not involve any questionable accounting. They argue that the fact that the tax deals were structured to provide accounting and tax benefits to Enron does not make them illegitimate or lacking in a valid purpose. In its opposition, Lead Plaintiff contends that they did not comply with GAAP and cites the Enron bankruptcy Examiner's identical conclusion as to the Steele, Cochise, Teresa and Tomas Projects. #1707 at 15 & n. 11. Moreover, even if they were in compliance, Lead Plaintiff argues that they were still fraudulent because they concealed from investors what was going on underneath Enron's financial statements to artificially inflate Enron's financial results. The Court finds that these are factual issues not appropri-ately resolved in a motion to dismiss, where the standard requires the Court to view alleged facts in a light most favorable to Lead Plaintiff.

### 2. 1933 Act Claims Against Deutsche Bank Entities

The claims against the Deutsche Bank Entities under § 12(a)(2),[28] and derivative claims under § 15 (control liability), arise from Deutsche Bank's participation as underwriter/initial purchaser of certain Enron Securities, including the following: (1) In January 1997, 6 million shares of 8-1/2% Enron capital preferred shares at $25 per share; (2) in February 1999, 27.6 million shares of Enron common stock at $31.34 per share; (3) in February 2001, $1.9 billion Enron Zero Coupon convertible bonds; and (4) on June 9, 1999 38.5 million shares of Azurix IPO at $19 per share. According to the complaint, Deutsche Bank served the same role for Enron-related Foreign Debt Securities offerings with purportedly false and misleading Offering Memoranda, relating to which Deutsche Bank failed to make reasonable investigation: (1) $1,400,000,000 8.31% Senior Secured Notes due in 2003, issued on 9/23/99 by Osprey Trust and Osprey I, Inc.; (2) $500,000,000 8% Enron Credit Linked Notes due in 2005, issued by Enron Linked Notes Trust on 8/17/00; (3) $750,000,000 7.9% Senior Secured Notes due in 2003 and Euros 315,000,000 6.375% Senior Secured Notes due in 2003, issued on 9/28/00 by Osprey Trust and Osprey I, Inc.; and (4) $475,000,000 6.31% Senior Secured Notes due in 2003 and Euros 515,000,000 6.19% Senior Secured Notes due in 2003, issued by Marlin Water Trust II and Marlin Water Capital Corporation II on 7/12/01.

---

**28.** "Any person ... who offers or sells ... shall be liable ... to the person purchasing such security from him ..." for false and misleading statements or omissions in or from prospectuses or other selling communications. 15 U.S.C. § 77*l*(a).

With respect to the newly added § 12(a)(2) claims, the Deutsche Bank Entities contend that Lead Plaintiff fails to identify material misstatements or omissions in the Offering Memoranda. Furthermore, relying on *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 576–78, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995), Defendants urge that the statute does not apply to private placements, as this Court has previously held. Defendants contend that the offerings in dispute were not made pursuant to a prospectus and were not public.[29] They have cited a recent unpublished opinion in which the district court found that the offering memorandum on its face had language which demonstrated that it was a private placement, and not offered pursuant to a "prospectus," but instead was an unregistered offering pursuant to Rule 144A and Regulation S.[30] *State of Alaska*

**29.** The Deutsche Bank Entities urge that the four Rule 144A/Regulation S note resales (the September 1999 Osprey Trust/Osprey I Inc. Notes, the September 2000 Osprey Trust/Osprey I, Inc. Notes, the August 2000 Enron Credit Notes, and the July 2001 Marlin Water Trust II/Marlin Water Capital Corp. II Notes, *see* Exs. 3–6 to #1621) were private placement resales to which § 12(a)(2) does not apply and thus the cause of action must be dismissed as to Deutsche Bank Securities Inc.

Alternatively, Deutsche Bank Entities argue that plaintiffs lack standing to pursue the § 12(a)(2) claims because they have not alleged and cannot claim to have purchased securities in any of the four resales, nor have they shown that the seller of the securities misrepresented or failed to state material facts in connection with the sale. The Court recently granted a motion to intervene brought by Imperial County Employees Retirement System ("ICERS"), which did purchase on July 12, 2001 $345,000 par value of Marlin Water Trust II Notes, for which Deutsche Bank served as one of the underwriters and which would have standing to sue.

**30.** Specifically, the district court in *Alaska* wrote,

The Offering Memorandum states that it "is personal to each person to whom it has been delivered and does not constitute an offer to any other person or to the public generally." It prohibits offerees from photocopying or disseminating the document. On its first page and in a section captioned "transfer restrictions," it explains that the Notes "have not been registered under the Securities Act and may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons except pursuant to an exemption from, in a transaction not subject to or in a transaction in compliance with the registration requirement of the Securities Act." Each note was required to bear a legend stating that the security "has not been registered under the Securities Act ... and may not be offered, sold, pledged or otherwise transferred" except in accordance with certain limitations, including the limitation that the acquirer be a "qualified institutional buyer" as defined by Rule 144A or "not a U.S. person as defined by SEC Regulation S."

The first page of the Offering Memorandum explains that the notes are being offered only "to qualified institution[al] buyers (as defined in rule 144A under the Securities Act) in compliance with Rule 144A and [ ] to non-U.S. persons outside the United States in reliance on Regulation S." The Offering Memorandum warns qualified institutional buyers that the seller "may be relying on the exemption from the provisions of Section 5 of the Securities Act provided by Rule 144A." Rule 144A exempts private placements from the registration requirements of Section 5. *See* 15 U.S.C. [§ ] 77(d)(2); 17 C.F.R. § 230.144A.

This Court would highlight the fact that the district court in *Alaska* also based its decision on the fact that the complaint itself alleged that the transaction was a private placement, but nevertheless in their motion the plaintiffs argued it was not.

As will be discussed, the Fifth Circuit, among others, follows the test established in *SEC v. Ralston Purina Co.*, 346 U.S. 119, 125–27, 73 S.Ct. 981, 97 L.Ed. 1494 (1953) (whether an offering is public depends on whether the class of persons affected by the offering need the protection of the Securities Act) to determine whether a transaction involves a "private offering" under § 4(2) of the 1933 Act [and the rules promulgated under it,

*Dept. of Revenue v. Ebbers (In re Worldcom, Inc. Sec. Litig.),* 294 F.Supp.2d 431 (S.D.N.Y.2002), attached as Ex. A to #1861.[31] The Court, noting that the Alaska Plaintiffs conceded they were "qualified institutional investors" as defined by 17 C.F.R. § 230.144A and Rule 144A, which "governs 'private resales of securities to institutions' and defines the 'qualified institutional buyer[s]' authorized to purchase in a private placement.'" *Id.* at 454.

Lead Plaintiff in opposition argues that under Fifth Circuit law, whether there is a public offering is a question of fact that must be examined under the circumstances of each case, with the burden of proof on Deutsche Bank Entities. *Hill York Corp. v. Am. International Franchises, Inc.,* 448 F.2d 680, 687 (5th Cir.1971); *Doran v. Petroleum Management Corp.,* 545 F.2d 893, 899 (5th Cir.1977). Lead Plaintiff insists that Deutsche Bank Entities cannot prove their affirmative defense because the smallest offering underwritten by them was $500 million, which by itself qualifies each offering as a public sale. *SEC v. Murphy,* 626 F.2d 633, 646 (9th Cir.1980) ("Without question [a sale of $7.5 million in securities] is a sizeable offering, and it is one we are inclined to consider as public ...."). Furthermore, argues Lead Plaintiff, the securities underwritten by Defendants were offered to a large number of investors.

Nor, Deutsche Bank Entities insist, does Lead Plaintiff state a claim for control person liability under § 15 of the 1933 Act or § 20(a) of the 1934 Act because it has failed to allege facts beyond a defendant's position or title to show that the defendant had actual power or control over the con-trolled person. See this Court's December 12, 2002 memorandum and order (#1194) at 64–67.

The Court disagrees with Defendants and finds that if Lead Plaintiff has stated a claim for liability under § 10(b) of the 1934 Act and/or § 12(a)(2) of the 1933 Act, it has sufficiently stated a claim for control person liability. As pointed out in its memorandum (#1707 at 35), the complaint alleges that Deutsche Bank AG is a integrated financial services institution composed of divisions and subsidiaries including Deutsche Bank Securities Inc. and Deutsche Bank Trust Company Americas, the later two are wholly owned and controlled subsidiaries of Deutsche Bank AG through which Deutsche Bank AG conducts its business affairs and all of whose stock is directly or indirectly owned by Deutsche Bank AG, and that Deutsche Bank completely directs and controls the subsidiaries' business operations *inter alia* by ownership and selection and appointment of their offices and, where necessary, their directors.

Lead Plaintiff argues that Sarbanes–Oxley's extended limitations period applies to the claims against newly added Defendants Deutsche Bank Trust Company Americas and Deutsche Bank Securities, Inc. in the Amended Consolidated Complaint, since these claims were commenced by the new complaint after the Act's enactment. The Court has previously rejected this argument. #1999 at 33–56.

Lead Plaintiff alternatively argues that even if the Court finds the extended limitations inapplicable, the filing of the tax claims against the new entities nevertheless satisfies the one-year statute of limita-

i.e., Regulation D], thereby exempting it from registration and prospectus requirements under § 5 of the Securities Act.

**31.** Now available at: *In re Worldcom, Inc. Sec. Litig.,* 294 F.Supp.2d 431 (S.D.N.Y.2003), *reconsideration denied,* 2004 WL 77879, 308 F.Supp.2d 214 (Jan. 20, 2004), and 2004 WL 473307 (S.D.N.Y. Mar.12, 2004).

tions. Deutsche Bank has itself stated that Plaintiffs were aware of the facts and circumstances surrounding the tax structure at least as long ago as May 22, 2002 [32]; the amended complaint was filed on May 14, 2003, within a year of the date it was put on notice.

Lead Plaintiff further insists the claims also fall within the *Lampf* three-year period of repose because the Deutsche Bank Entities' argument that the tax Projects "closed" more than three years before the First Amended Consolidated Complaint was filed ignores the amended complaint's allegations of the Deutsche Bank Entities' ongoing, active, primary participation in these Projects, which inflated Enron's earnings subsequently over a period of years and continuously paid the Deutsche Bank Entities fees for their work, indeed through the Class Period. In other words, Lead Plaintiff looks not to the date each scheme was structured or "closed," but to the ongoing acts to effectuate the scheme by Defendants leading to fraudulent results within the Class Period, i.e., it seeks application of a "continuing violation theory" to the Ponzi scheme.

For example, according the latest complaint, Cochise, like Project Steele, involved the transfer of mortgage-backed securities and other assets from Deutsche Bank to an Enron affiliate, with both Enron and Bankers Trust improperly sheltering taxable income through deductions for losses involving the same assets. As the first stage of the project, Enron purchased two airplanes from Deutsche Bank for $46.7 million in January 1999, which Deutsche Bank repurchased on June 28, 2000 for $36.5 million, and which Enron bought back one month later through an Enron subsidiary, Oneida. When Enron fraudulently sold the planes back to Deutsche Bank on June 28, 2000, which act was within three years of the filing of the First Amended Complaint and thus within the period of repose under § 10(b), Enron reported the full proceeds as net income, in violation of GAAP, as was found by the bankruptcy Examiner, 3rd Report, App. G at 54. Moreover, pursuant to a shareholder agreement, Deutsche Bank became a partner with Enron in a fraudulent Deutsche Bank entity called Maliseet to further Project Cochise through acts as late as January 28, 2001. Cochise artificially inflated Enron's earnings by $27.7 million in 1999, $50.3 million in 2000, and 23.2 million in 2001 (for a total of $101 million during 1999–2001). This inflated income was reported in Deutsche Bank's analyst reports and Enron's financial statements. As with the other STDs, an opinion letter from an established law firm made clear that the purpose of the transaction was inflating Enron's financial statements.

Similarly the amended complaint asserts that Project Steele also allowed Enron and Deutsche Bank to claim a tax deduction for the same group of mortgage-backed securities. Enron and Bankers Trust used a new partnership, ECT Partners, jointly owned by Enron and Bankers Trust, to which Bankers Trust transferred money-losing securities. (Deutsche Bank purchased a 5% preferred ownership interest in ETC. to achieve the inflated Enron financial statements.) According to the complaint, the Internal Revenue Code prohibits a company from buying another entity, in this case Enron and Bankers Trust, merely to acquire its tax deductions. The

---

**32.** Although Deutsche Bank also contends that plaintiffs had notice of alleged fraud on October 22, 2001, Lead Plaintiff maintains that plaintiffs had no reason to suspect that Deutsche Bank was involved in tax deals with Enron and that Deutsche Bank cannot cite any publicly available facts that should have put plaintiffs on notice at that time.

complaint charges that Enron claimed the deal was not for tax avoidance, but for "obtain[ing] financial income" benefits, in other words "to inflate earnings," both illicit purposes according to Lead Plaintiff. Project Steele purportedly provided $65 million in net earnings to Enron from 1997 through 2001.

## B. Court's Rulings

### 1. Exchange Act Claims

### (a) Pleading Sufficiency under § 10(b)

■ After reviewing all of the circumstances alleged in the First Amended Consolidated Complaint, buttressed substantially by the detailed claims relating to the STDs, the Court finds that if the claims based on the STDs were not time-barred, Lead Plaintiff has adequately and particularly stated a claim against the Deutsche Bank Entities as secondary actors committing primary violations of § 10(b) and Rule 10b–5, including facts giving rise to a strong inference of scienter on their part. It has asserted that the six distinct STDs, each described in some detail, violated GAAP by serving solely to falsely report inflated income for Enron; violated Rule 10b–5 in deceiving investors by misleading the public, which had no way to know that the purported pre-tax earnings income came from potential benefit of speculative future tax deductions based on hidden STDs; and violated the Tax Code and the business purpose rule in order to fraudulently inflate financial results. It also, throughout the Class Period, issued analyst reports with strong "Buy" recommendations and laudatory statements about the company despite its knowledge that the financial reports were false, in substantial part because of the undisclosed STDs.[33]

### (b) Statute of Limitations for § 10(b) Claims re Tax Schemes and Added Entities

Nevertheless, because the Court finds that the claims based on the STDs are time-barred, the Court finds that the pleadings, without those claims, are insufficient to raise the requisite strong inference of scienter and to state a claim against the Deutsche entities under § 10(b). Because the time bar of limitations reduces the number of viable claims to just a single STD, again, without the pattern of tax schemes, the pleadings fail to meet the requirements of the PSLRA.

There are insurmountable challenges under the applicable period of repose and statute of limitations for both the § 10(b) claims, and therefore the derivative § 20(a) control person claim, based on the STDs. Because of the limitations bar, the Court concludes that Lead Plaintiff has failed to state a claim against the Deutsche Bank Entities under these two statutes.

---

33. In its memorandum of law in opposition, Lead Plaintiff has quoted the Bankruptcy Examiner's Third Report, App. G at 22–23, to argue that by 2000, while continuing to recommend Enron securities, Deutsche Bank had learned a substantial amount about Enron's undisclosed and precarious off-balance sheet debt:

In early 2000, BT/Deutsche became cognizant of a change in Enron's balance sheet and income statement. . . . *Recognizing that the extent of Enron's off-balance sheet obligations could not be discerned from its financial statements,* BT/Deutsche held several meetings with Enron to probe the increasing dependency of Enron on its trading activities and asset sales. During those meetings, BT/Deutsche requested and received information about [among other things] the level of [Enron's] off-balance sheet obligations . . . . *Enron consistently informed BT/Deutsche that its off-balance sheet obligations were in the range of $9– 10 billion.*
# 1707 at 25.

### (i) Sarbanes–Oxley Act

■ The Court hereby incorporates the law relating to statutes of limitations applicable to claims under § 10(b) and § 20(a) of the 1934 Act and to § 11, § 12(a)(2), and § 15 of the 1933 Act, which it set out in its February 25, 2004 memorandum and order (# 1999) at 24–63, regarding the Imperial Employees Retirement System's motion to intervene.

As noted, the Court has previously rejected the argument that the extended statute of limitations in the Sarbanes–Oxley Act applies to both § 10(b) and § 12(a)(2) claims in the *Newby* class action for reasons that apply here. Thus the Court holds that the one-year/three-year limitations period set out in *Lampf* applies to the § 10(b) and derivative § 20(a) claims asserted here, while the one-year/three-year periods of § 13 applies to Lead Plaintiff's claims under the 1933 Act.

### (ii) Continuing Violation Theory

■ Lead Plaintiff has also argued that even if the close date of each STD project constituted a securities violation, the close was "part of a continuing conduct that violated § 10(b) throughout the Class Period"[34] and which was not apparent until much later in the scheme. Lead Plaintiff maintains that the "STDs did *not* end at the purported 'close' date of the transactions," which referred merely to "the signing of documents forming a partnership or some other entity in which Enron and Deutsche Bank called themselves investors"; instead "[i]n each STD, Deutsche Bank continued to play a significant role in

carrying out the transaction over a period of several years" and the STDs "inflated Enron's financial statements after they 'closed.'" Moreover, Deutsche Bank continued to receive fees and issue false and misleading analyst reports while underwriting Enron and Enron-related securities offerings and participating in LJM2. # 1707 at 7–8. Lead Plaintiff contends that the "'close' of the transactions was a part of continuing conduct that violated § 10(b) repeatedly throughout the Class Period." *Id., citing Huckabay v. Moore,* 142 F.3d 233, 239 (5th Cir.1998); *SEC v. Ogle,* No. 99 C 609, 2000 WL 45260, *4–5 (N.D.Ill. Jan.11, 2000) (applying continuing violation theory to § 10(b) action seeking equitable remedies of accounting, disgorgement and injunction in addition to civil penalties because the SEC was unable "to detect discrete violations until the alleged scheme was well underway" and because the charged market manipulation was ongoing). Lead Plaintiff urges that there was no securities violation until Enron's financial results were inflated by the STDs, specifically by Deutsche Bank's conduct after the "close" date. # 1707 at 8 ("If Deutsche Bank did not carry out the transactions after the transactions were conceived and documented, Enron's financial statements would not have been affected.").

The "continuing violation" doctrine arose in the context of Title VII employment discrimination cases, 42 U.S.C. § 2000e *et seq.,* as an equitable exception to the statute's brief period for filing charges with

---

**34.** The First Amended Consolidated Complaint at 532, ¶ 797.9, asserts,

> While some of the fraudulent tax transactions devised by Bankers Trust/Deutsche Bank were created before the Class Period, each transaction resulted in the artificial inflation of Enron's reported financial re-

> sults during the Class Period because each transaction resulted in the fraudulent recognition of income and purported tax savings going forward, resulting in the accrual of benefits years after the actual transaction closed.

the EEOC,[35] which is shorter than that allowed under *Lampf,* 501 U.S. at 364, 111 S.Ct. 2773 ("Litigation instituted pursuant to § 10(b) and Rule 10b–5 ... must be commenced within one year after discovery of the facts constituting the violation and within three years after such violation)" or under Sarbanes–Oxley for § .10(b) claims. Unlike § 10(b) and § 12(a)(2), Title VII has no statute of repose that provides an arbitrary and final cut-off, but only a statute of limitations, which is subject to equitable considerations.

The continuing violation theory relieves a plaintiff of establishing that all of the complained-of conduct occurred within the actionable period if the plaintiff can show a series of related acts, one or more of which falls within the limitations period.... The core idea [of the continuing violations theory,] however, is that [e]quitable considerations may very well require the filing periods not begin to run until facts supportive of a Title VII charge or civil rights action are or should be apparent to a reasonably prudent person similarly situated. The focus is on what effect, in fairness and logic, should have alerted the average lay person to act to protect his rights. At the same time, the mere perpetuation of the effects of time-barred discrimination does not constitute a violation of Title VII in the absence of independent actionable conduct occurring within the statutory period.... Thus, a plaintiff can avoid a limitations bar for an event that fails to fall within the statutory period where there is "[a] persistent and continuing system of discriminatory practices in promotion or transfer [that] produced effects that may not manifest themselves as individually discriminato-

ry except in cumulation over a period of time." [citations omitted]

*Messer v. Meno,* 130 F.3d 130, 134–35 (5th Cir.1997), *cert. denied sub nom. Texas Educ. Agency v. Messer,* 525 U.S. 1067, 119 S.Ct. 794, 142 L.Ed.2d 657 (1999). *See also Waltman v. International Paper Co.,* 875 F.2d 468, 474 (5th Cir.1989)(the continuing violation equitable exception to limitations arises " '[w]here the unlawful employment practice manifests itself over time, rather than as a series of discrete acts.' "). Moreover, the Fifth Circuit has stated,

Although there is no definitive standard for what constitutes a continuing violation, the plaintiff must demonstrate more than a series of discriminatory acts. He must show an organized scheme leading to and including a present violation, ... such that it is the cumulative effect of the discriminatory practice, rather than any discrete occurrence, that gives rise to the cause of action [citations omitted].

*Huckabay,* 142 F.3d at 239. Traditionally in Title VII cases three factors for the court to consider in determining whether there is a continuing violation are (1) whether the alleged acts consist of the same type (a pattern) of discrimination outside and inside the limitations period that would support a valid connection or were substantially different, (2) whether the acts are recurring or more like isolated incidents and (3) whether the act has a degree of permanence that would awaken an employee to a duty to assert his rights. *Id.* at 239.

Unlike securities claims, the time for filing charges with the EEOC in an employment discrimination action has long been viewed as not jurisdictional and as

---

**35.** A Title VII plaintiff must file a charge of discrimination with the Equal Employment Opportunity Commission within 180 days (or 300 days in "deferral" states) after the alleged discriminatory act occurred. 42 U.S.C. § 2000e–5(e)(1).

"subject to equitable doctrines such as tolling or estoppel." *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982); *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).

Few courts have addressed whether or not the continuing violation doctrine applies to securities fraud cases under the one-year/three-year limitations provisions for claims under § 10(b) under *Lampf* and for claims § 12(a)(2) through § 13. As the only federal appellate court that has done so, the Fourth Circuit, based on the language in *Lampf* stating that equitable tolling does not apply to the period of repose for claims under § 10(b), has rejected the continuing violation doctrine's application to securities fraud claims. *Caviness v. Derand Resources Corp.*, 983 F.2d 1295, 1301–02 (4th Cir.1993). Rebuffing the plaintiffs' argument that "the running of [the] limitations period is tolled by fraudulent concealment and that defendants should be equitably estopped from relying on plaintiffs' failure to establish the limitation requirements," the panel concluded that such equitable tolling would "ignore the plain meaning of the language [of § 13] that says 'in no event' may an action be filed more than three years after the sale and defeat the very purpose of the statute of repose." *Id.* at 1301. "It would also render meaningless the discovery standard that *is* applied to the one-year limitation provision." *Id.* The Fourth Circuit also relied on the Supreme Court's determination in *Lampf* that the one-year period "by its terms, begins after discovery of the facts constituting the violation, making tolling unnecessary." *Id. See also de la Fuente v. DCI Telecommunications, Inc.*, 206 F.R.D. 369, 385–86 (S.D.N.Y.2002), *citing SEC v. Caserta*, 75 F.Supp.2d 79, 89 (E.D.N.Y.1999), and *SEC v. Schiffer*, 97–CV–5852 (RO), 1998 WL 226101, *3 (S.D.N.Y. May 5, 1998). This Court finds its rationale persuasive.

The only case this Court has found recognizing the application of the continuing violation theory in a securities fraud action was cited by Lead Plaintiff.[36] *SEC v. Ogle*, No. 99 C 609, 2000 WL 45260, *4–5 (N.D.Ill. Jan.11, 2000). Nevertheless, this Court finds its conclusion unconvincing because the court ignored the existence of the statute of repose, which the *Lampf* court emphasized serves as a final cutoff.

Moreover, even if the continuing violation doctrine were applicable to securities violations in *Newby*, in a 5–4 decision authored by Justice Clarence Thomas, the United States Supreme Court has recently constricted the scope of the doctrine. *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). In *National R.R. Passenger Corp.* the high court examined and rejected the Ninth Circuit's rule that a plaintiff

---

**36.** In *SEC v. Ogle*, No. 99 C 609, 2000 WL 45260, *4–5 (N.D.Ill. Jan.11, 2000), the SEC alleged that the defendants had manipulated the market in violation of § 17(a) of the 1933 Act and § 10(b) of the 1934 Act. The defendants, after acquiring stock in Exsorbet Industries prior to the public opening, manipulated Exsorbet's market by convincing others to purchase the stock, with the purpose of driving up its trading price, and then sold their own stock at the resulting inflated rates. The district court found that the SEC was "unable to detect discrete violations until the alleged scheme was underway" in what became a "long-term market manipulation scheme" and that "the alleged market manipulation itself was fluid and ongoing and not a discrete goal." *Id.* at *4–5. It cited an administrative decision in which the judge had found a continuing pattern of churning that could only have been realized "on a hindsight analysis of the entire history of a brokers's management of an account and of his pattern of trading that portfolio." *Id.* at *5, citing In re Donald A. Roche,* 1997 WL 328870 (SEC June 17, 1997).

can establish a continuing violation and thereby recover for discriminatory acts outside of the statutory period by (1) showing "a series of acts one or more of which are within the limitations period," what the Ninth Circuit called "serial violations"; and (2) showing " 'a systematic policy or practice of discrimination that operated, in part, within the limitations period—a systemic violation.' " *Id.* at 107, 122 S.Ct. 2061. Distinguishing among claims of hostile work environment and discrete acts of discrimination and retaliation (both of which were brought by the appellee, Abner Morgan, Jr.), Justice Thomas emphasized the high court's "strict adherence to the procedural requirements specified by the legislature [as] the best guarantee of evenhanded administration of" Title VII and of the statutory language mandating that an EEOC charge "*shall be filed* within one hundred and eighty days *after the alleged unlawful employment action occurred.*" The Supreme Court concluded that this statutory language requiring individuals to file an EEOC charge within 180 days (or 300 days in deferral states) bars any suits alleging discrete acts of discrimination that occur on identifiable dates where that filing deadline is not met. 536 U.S. at 108–09, 122 S.Ct. 2061 (emphasis in decision's text). "A discrete retaliatory or discriminatory act 'occurred' on the date that it 'happened,' " so a plaintiff must file a charge within the 180 or 300 days or he is barred from pursuing it. *Id.* at 110, 122 S.Ct. 2061. Moreover Justice Thomas opined that the word "practice" in the statute does not "connote[ ] an ongoing violation that can endure or recur over a period of time," because the statute in great detail identifies the kinds of actions that are actionable, including numerous discrete acts such as failing or refusing to hire or to discharge an individual on the basis of race, color, religion, sex, or na-

tional origin. *Id.* at 110–111, 122 S.Ct. 2061. The Supreme Court has "repeatedly interpreted the term 'practice' to apply to a discrete act or single 'occurrence,' even when it has a connection to other acts." *Id.* at 111, 122 S.Ct. 2061. The Supreme Court has also "held that discrete acts that fall within the statutory time period do not make timely acts that fall outside the time period." *Id.* 112, 122 S.Ct. 2061. Justice Thomas summarized,

> We derive several principles from these cases. First, discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the 180– or 300–day period after the discrete discriminatory act occurred. The existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed. Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim.

*Id.* at 113, 122 S.Ct. 2061. Moreover, although Title VII's time limitations are not jurisdictional and even though equitable tolling or estoppel doctrines may apply to filing a charge, "they are to be applied sparingly." *Id.* Justice Thomas did acknowledge,

> There may be circumstances where it will be difficult to determine when the time period should begin to run. One issue that may arise in such circumstances is whether the time begins to run when the injury occurs as opposed to when the injury reasonably should

have been discovered. But this case presents no occasion to resolve that issue.

*Id.* at 114 n. 7, 122 S.Ct. 2061. Nevertheless, as this Court has highlighted, there is no arbitrary cutoff by a statute of repose for Title VII, unlike for § 10(b).

In sum this Court concludes that the limitations bar in the *Newby* securities fraud action should not be equitably tolled by a continuing violation theory. It agrees with the Fourth Circuit in *Caviness,* analyzing the Supreme Court's language in *Lampf,* regarding the balancing effect of the statute of repose's absolute "cut-off" function against the one-year inquiry-notice statute of limitations for § 10(b) claims, in addition to the clear language in § 13. These undermine Lead Plaintiff's argument that a continuing violation theory should save from a limitations bar **all** of its claims based on acts relating to all STDs. Moreover, under the facts pleaded here, this Court concludes that the continuing violations doctrine should not apply. Lead Plaintiff has alleged a formal "close" of a tax scheme, i.e., an execution of documents establishing a partnership or association for purposes of· realizing tax savings, a discrete act, followed by continuing discrete acts by Deutsche Bank Entities effectuating the various tax schemes at different times in different ways by use or abuse of that legal relationship.

**(iii) Period of Repose and Tax Scheme Claims**

■ Therefore for limitations purposes, at issue here is at what point the period of repose begins to run for claims under § 10(b). Defendants make a rational argument that "the closing of each [SDT] created the pool of assets and the structure that then supported the economic benefits flowing from the transactions"

and was thus a discrete act that commenced the fraud. # 1751 at 8. Even if the Court views the pleadings in a light most favorable to Lead Plaintiff and accepts what Lead Plaintiff argues, i.e., that the "closing" was merely a signing of the documents to establish a legal relationship and did not trigger the period of repose for each STD, then the Court concludes that the first discrete act immediately after such document execution in each STD surely would start the running of the period of repose. Lead Plaintiff bears the burden of establishing the date of that first discrete act in the execution of each STD scheme and of showing that the First Amended Consolidated Complaint was filed within three years of those dates to establish a scheme of STDs, but it has· not done so. Even if it had, it must also have satisfied the one-year, inquiry-notice period for filing suit: at what point in each scheme should an ordinary investor reasonably have recognized that his interest was being harmed and that an investigation should be undertaken, and whether he subsequently timely filed suit.

From an examination of Lead Plaintiff's First Amended Consolidated Complaint and its pleadings relating to the motion to dismiss, it is facially apparent that some § 10(b) STD-based claims are obviously time-barred. Lead Plaintiff has identified step 1 of Project Cochise, the purchase of two airplanes by Enron from Deutsche Bank as occurring in January 1999. # 1707 at 9. Thus the period of repose as to Project Cochise would have expired in January 2002, before the First Consolidated Complaint was filed on April 8, 2002 (if the Court were to allows the claims to "relate back") and long before the filing of the First Amended Consolidated Complaint in May 2003. Lead Plaintiff also quotes the JCT Report identifying the "initial step in the implementation of Project Teresa" as the contribution of property by Enron and

EN–BT Delaware, Inc. (a Deutsche subsidiary) to Organization Partner, Inc. in exchange for stock on March 21, 1997. # 1707 at 12. Thus the period of repose also expired as to claims relating to Teresa. Although the Court is unable to determine with certainty from the pleadings when the first discrete act of execution occurred, statements in Lead Plaintiff's pleadings imply that claims based on other tax schemes are also time-barred with the exception of Valhalla. Lead Plaintiff indicates that Project Steele through Enron SPE and Deutsche Bank's ECT Partners contributed millions to "Enron's bottom line from 1997 . . . ." # 1707 at 11. Lead Plaintiff also states, "In October 1997, Deutsche Bank bought into ECT Partners (the Enron SPE at the heart of Project Steele," suggesting that claims based on Project Steele are time-barred)." With respect to Tomas, the pleadings do not provide the date of formation of Seneca, an Enron/Deutsche Bank partnership, and of its receipt of lease assets that it was to hold for two years, but does state that the assets were sold in December 2000, after which Seneca ceased to exist. That fact suggests that Seneca received the assets in 1998, and thus claims based on Tomas would also be time-barred. There are no facts provided about Projects Renegade and Valhalla as to when the first discrete act in execution of those alleged tax schemes occurred. Lead Plaintiff has not met its burden of pleading, no less ultimately proving, its claims are timely.

### (iv) Relation Back and Equitable Tolling/Estoppel Doctrines

Having attempted to circumvent a limitations bar by arguing first that the longer three-year/five-year limitations periods under Sarbanes–Oxley Act governs the First Amended Consolidated Complaint and then that the continuing violation theory should apply here, both of which contentions this Court has rejected, Lead Plaintiff alternatively urges the Court to find that the addition of the two new Deutsche entities and the claims against them "relate back" to the filing date of the first consolidated pleading (April 8, 2002) under Rule 15(c). It maintains that the Bank Defendants cannot reasonably claim prejudice by surprise because the amendment addresses mistakes that Bank Defendants claimed existed in the First Consolidated Complaint. The "relation back" issue has been raised by numerous Bank Defendants in their motions to dismiss. In essence, Bank Defendants argue that Lead Plaintiff originally named the wrong parties, i.e., the bank parent companies, and now untimely adds their subsidiaries as Defendants.

At issue here is whether Rule 15(c) will allow the First Amended Consolidated Complaint to relate back to the date of the filing of the First Consolidated Complaint and avoid one-year limitations bar against (1) newly added Deutsche Defendants and (2) the newly added STD claims. Leave to grant a Rule 15(a) motion is subject to the court's sound discretion, limited by Rule 15(a)'s mandate that "leave shall be given when justice so requires." *Jacobsen,* 133 F.3d at 318, *quoting* Rule 15. Among the factors a court may consider are any undue delay, bad faith, or dilatory motive on Movant's part, redundant failure to plead adequately in previous amendments, futility of any amendment, and undue prejudice to the NonMonvant. *Id.*

Addressing "Relation Back of Amendments," Rule 15(c) allows the amendment of a complaint to add or change a party defendant after limitations has expired under certain conditions. It provides in relevant part,

> An amendment of a pleading relates back to the date of the original pleading when

(1) relation back is permitted by the law that provides the statute of limitations applicable to the action, or

(2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, or

(3) the amendment changes the party or the naming of the party against whom a claim is asserted if the foregoing provision (2) is satisfied and within the period provided by Rule 4(m) [with 120 days following the filing of the complaint] for service of the summons and complaint, the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.[37]

**37.** Before Rule 15(c) was amended in 1991, it provided,

> Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading. An amendment changing the party against whom a claim is asserted relates back if the foregoing provision is satisfied and, within the period provided by law for commencing the action against the party to be brought in by amendment that party (1) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

The United States Supreme Court in *Schiavone v. Fortune*, 477 U.S. 21, 106 S.Ct. 2379, 91 L.Ed.2d 18 (1986) held that there were four requirements for a relation back to the filing date of the original complaint under this version of Rule 15(c):

> (1) [T]he basic claim must have arisen out of the conduct set forth in the original pleading; (2) the party to be brought in must have received such notice that it will not be prejudiced in maintaining its defense; (3) that the party must or should have known that, but for the mistake concerning identity, the action would have been brought against it; and (4) the second and third requirements must have been fulfilled within the prescribed limitations period.

*Id.* at 29, 106 S.Ct. 2379. In *Schiavone*, the plaintiff brought a libel suit against "Fortune," a company with no independent corporate existence since it was actually an internal division of Time, Inc. The plaintiff filed the action within the statute of limitations, and officials of Time, Inc. received the service of process addressed to Fortune. The plaintiff subsequently served Time with process only after the statute of limitations had run. Even though the officials had received actual notice of the suit within the limitations period, the *Schiavone* decision strictly construed the phrase "within the period provided by law" in Rule 15(c), relating to the time of notice, as meaning within the applicable statute of limitations for the particular type of claim. Subsequently a 1991 amendment to Rule 15 expressly changed that wording of the rule because "the Court reached a result in *Schiavone* ... that was inconsistent with the liberal pleading practices secured by Rule 8"; the amendment provides that an amended complaint relates back to the time the original complaint was filed if the new party was aware of the action within 120 days of that filing. In other words, the phrase "within the period provided by law" applies not to the statute of limitations of the cause of action, but refers instead to the Rule 4m period (120 days). Rule 15 Advisory Note (1991) ¶ (c)(3). Thus the current requirements under the amended Rule 15(c) still are that a new party (1) receive notice of the action so as not to be prejudiced in maintaining a defense and (2) knew or should have known that the action would have been brought against it earlier but for a mistake of identity. *Aslanidis v. United States Lines, Inc.*, 7 F.3d 1067, 1076 (2d Cir.1993), *citing* 3 James W. Moore & Richard D. Freer, *Moore's Federal Practice* ¶ 15.15[4.–2] at 161 (2d ed.1993). *See Skoczylas v. Federal Bureau of Prisons*, 961 F.2d 543, 544–45 (5th Cir.1992)(under the amended Rule 15(c) "instead of requiring

"Notice may be formal or informal." *Montgomery v. U.S. Postal Service,* 867 F.2d 900, 903 (5th Cir.1989), *citing Honeycutt v. Long,* 861 F.2d 1346, 1350 (5th Cir.1988)(in dictum), and the Advisory Committee Note on the 1966 amendment to Rule 15(c).

■ With respect to subpart (3)(A)'s notice clause requirement, the Fifth Circuit "will infer notice if there is an identity of interest between the original defendant and the defendant sought to be added or substituted." *Jacobsen v. Osborne,* 133 F.3d 315, 320 (5th Cir.1998), *citing Moore v. Long,* 924 F.2d 586, 588 (5th Cir.1991), and *Kirk v. Cronvich,* 629 F.2d 404, 407–08 (5th Cir.1980). " 'Identity of interest generally means that the parties are so closely related in their business operations or other activities that the institution of an action against one serves to provide notice of the litigation to the other.' " *Id., quoting Kirk,* 629 F.2d at 408 n. 4. The relationship between a parent and a wholly owned subsidiary, or "between related corporations whose officers, directors, or shareholders are substantially identical and who may have similar names or conduct their business from the same offices," may satisfy the identity-of-interest test. 6A Charles Alan Wright, Arthur K. Miller, and Mary Kay Kane, *Federal Practice and Procedure* § 1499 at 147–50 (2d ed.1990). *See also Hernandez Jimenez v. Calero Toledo,* 604 F.2d 99, 102–03 (1st Cir.1979)("The identity of interest principle is often applied where the original and added parties are substantially identical and who have similar names or share office space, past and present forms of the same enterprise, or coexecutors of an estate."), *quoted for that proposition in Norton v. International Harvester Co.,* 627 F.2d 18, 21 (7th Cir.1980).[38]

Moreover, as another basis, the Fifth Circuit in *Jacobsen* stated that the court can judicially notice such identity of interest where the old and new parties share counsel. 133 F.3d at 320 ("notice may be imputed to the new party through shared counsel"). Other courts accepting imputing notice based on a shared attorney include *Gleason v. McBride,* 869 F.2d 688, 693 (2d Cir.1989)("[T]o support an argu-

notice within the limitations period, relation back is allowed as long as the added party had notice within 120 days following the filing of the complaint or longer if good cause is shown. Fed.R.Civ.P. 4(j).").

**38.** The Second Circuit, which questions whether an identity of interest exception exists, does not agree that the mere fact that a parent and wholly owned subsidiary are involved supports relation back and argues for evidence of the particular entanglement of the two entities:

> We assume for purposes of this discussion that an identity of interest exception exists. But it is clear that sufficient identity of interest to warrant imputation of notice is lacking in this case. Courts accepting that rationale have required substantial structural and corporate identity, such as shared organizers, officers, directors and offices.... In the instant case none of these relationships were found to exist between Raytheon and Caloric. Further the parent-

subsidiary relationship standing alone is simply not enough—as Professors Wright and Miller perhaps too optimistically state ...—to establish the identity of interest exception to the relation back rule. Greater identity of interest must be shown than this record reveals. The two businesses must have organized or conducted their activities in a manner that strongly suggests a close linkage. Recognizing this, appellant makes much of the shared legal counsel and parses Heveran's role as Caloric's counsel into something more than it really was. Consequently, we conclude the identity of interest exception may not be used to impute to Raytheon the timely service of pleadings made on its subsidiary Caloric.

*In re Allbrand Appliance & Television Co., Inc.,* 875 F.2d 1021, 1025–26 (2d Cir.1989). The Fifth Circuit, however, does not make this inquiry more stringent, as discussed.

ment that knowledge of the pendency of a lawsuit may be imputed to a defendant or set of defendants because they have the same attorney(s), there must be some showing that the attorney(s) knew that the additional defendants would be added to the existing suit."), and *Berndt v. State of Tenn.*, 796 F.2d 879, 884 (6th Cir.1986). *See also Singletary v. Pennsylvania Dept. of Corrections,* 266 F.3d 186, 196 (3d Cir. 2001)("The 'shared attorney' method of imputing Rule 15(c)(3) notice is based on the notion that, when an originally named party and the party who is sought to be added are represented by the same attorney, the attorney is likely to have communicated to the latter party that he may very well be joined in the action"; recognizing this approach but treating it separately from identity of interest as a method of imputing notice to new party). In *Singletary,* because the attorney originally entered an appearance for all Defendants and there was no evidence that the attorney had any kind of relationship with the later added party, the court performed a fact-specific analysis and found that the circumstances were insufficient to impute notice to the newly added defendant. *Id.* at 196–97.

With respect to the identity of interest exception, here Lead Plaintiff has asserted that it satisfied the notice prong because it has (1) conclusorily alleged that the newly added Deutsche entities are wholly owned subsidiaries of, and controlled by, Deutsche Bank AG and (2) apparently, as reflected in the record, share the same counsel in this litigation. For purposes of this motion the Court finds that it has

satisfied the notice prong under Fifth Circuit law.

■■■ In addition to the notice clause of subpart (3)(A), however, the "mistake clause" of subpart (3)(B) must also be satisfied for the amended complaint to "relate back." Where the change in naming parties or substituting new parties was not the result of a *mistake,* i.e., misidentification or misnomer, but rather because the plaintiff did not know the identity of the defendant originally, the relation-back doctrine does not apply. *Jacobsen,* 133 F.3d at 320–21,[39] *citing Barrow v. Wethersfield,* 66 F.3d 466, 470 (2d Cir.1995)("Rule 15(c) does not allow an amended complaint adding new defendants to relate back if the newly-added defendants were not named originally because the plaintiff did not know their identities."), *modified on other grounds,* 74 F.3d 1366 (2d Cir.1996); *Worthington v. Wilson,* 8 F.3d 1253, 1257 (7th Cir.1993)("Because Worthington's failure to name [the correct officers] was due to a lack of knowledge as to their identity, and not a mistake in their names, Worthington was prevented from availing himself of the relation back doctrine of Rule 15(c)."); and *Wilson v. United States Government,* 23 F.3d 559, 562–63 (1st Cir.1994)(relation back is not allowed when the plaintiff simply lacks knowledge of the proper party).

In Lead Plaintiff's Memorandum in Opposition to the Bank Defendants' Motions to Dismiss the First Amended Consolidated Complaint (# 1574) at 24, Lead Plaintiff has argued "mistake in fact as to identity" and "mistake in law"[40] and insists that

**39.** At issue in *Jacobsen,* was whether, under the circumstances in that case, "to prevent a time-bar, an amendment to substitute a named party for a 'John Doe' defendant may relate back under amended Rule 15(c)(3)." 133 F.3d at 320. It held that there was no "mistake" in failing to identify the correct defendants because the plaintiff used John

Doe because he did not know the identity of the defendant.

**40.** A number of federal courts have recognized a distinction between a "mistake of fact" and a "mistake of law" in construing "mistake concerning the identity of the proper party" in Rule 15(c). *In re Worldcom, Inc.*

"Bank Defendants, with their superior information concerning the identity and involvement of their subsidiaries in the Enron fraud, ought to have anticipated (and did) that culpable entities would be added as defendants here, after correct identities were revealed." Lead Plaintiff objects to Bank Defendants' characterization that Lead Plaintiff made a deliberate tactical or strategic decision to name only certain bank entities and thus is not entitled to "relation back" pursuant to Fed.R.Civ.P. 15(c); Lead Plaintiff claims that on April 8, 2002, when it filed the First Consolidated Complaint, its "naming of the bank defendants originally sued was based on the limited information then available, without the benefit of documents and testimony later obtained and released by the Senate or by Enron's Bankruptcy Examiner. Indeed, while the Bank Defendants claimed this was a case of mistaken identity in their pleading motions and answers in response to the Consolidated Complaint, most did not divulge the identities of the culpable subsidiaries." *Id.* Deutsche Bank is one of those who kept silent. Indeed, as Lead Plaintiff asks, why would the Bank Defendants identify any of their own subsidiaries involved in the Enron fraud? Lead Plaintiff cites *Berrios v. Sprint Corporation,* No. CV–97–0081 (CPS), 1997 WL 777945, *5–6 (E.D.N.Y. Nov.13, 1997), in which the district court found that Rule 15(c) applied to the addition of a subsidiary of a corporate defendant where the corporate defendant made it difficult to determine which was ultimately responsible for the alleged wrongdoing and the plaintiff corrected her "mistake" in initially suing

only the parent company. *See also De Coelho v. Seaboard Shipping Corp.,* 535 F.Supp. 629 (D.Puerto Rico 1982)(because named defendant "chose to remain silent and take advantage of plaintiff's mistake" in suing the wrong corporate entity, and because there was sufficient notice to the proper party because the three Moran corporations with similar names and closely related interests were involved in administrate proceedings before the Insurance Fund and the U.S. Coast Guard, the court found these factors complied with Rule 15(c)'s requirements and mandated allowing the amendment); *Findley v. City of Baton Rouge,* 570 So.2d 1168, 1171–72 (La. 1990)("Rule 15(c) was amended for the purpose of preventing unjust results when a plaintiff, confronted with a maze of closely related corporate or governmental entities, initially chooses the wrong one to sue, unless prejudice [to the added defendant] exists."); *Zimmer v. United Dominion Industries, Inc.,* 193 F.R.D. 620, 623 (W.D.Ark.2000)("under the identity-of-interests doctrine, when a complaint has been timely filed and timely notice has been given to the party named in the complaint, notice may be imputed to a subsequently named and sufficiently related party"). Lead Plaintiff contends that in light of the identity of interest among the Deutsche Bank Entities and the sheer size, scope, complexity and novelty of the *Newby* litigation, Defendants' charge that Lead Plaintiff deliberately sued only some entities and must abide by that choice "defies common sense and defendants do not (and cannot) identify a rational 'strategy' explaining why Lead Plaintiff would choose

.

---

*Sec. Litig.,* 294 F.Supp.2d 431, (S.D.N.Y. 2003)(a plaintiff's mistake about identity of party is a mistake of fact, while mistake about legal requirements of cause of action is a mistake of law), *reconsideration denied,* 2004 WL 77879 (S.D.N.Y. Jan.20, 2004); *Soto v. Brooklyn Correctional Facility,* 80 F.3d 34, 36

(2d Cir.1996)("mistakes" under Rule 15(c) also include mistakes of law). The Fifth Circuit does not appear to have applied this distinction, but focuses on what would be mistakes of fact or a conscious choice not to sue a particular party.

to circumscribe its claims in the Consolidated Complaint—especially as to viable, significantly culpable defendants." *Id.* at 24.

This Court observes that in *Jacobsen,* the Fifth Circuit not only found that the plaintiff in a § 1983 suit alleging false arrest and abuse by sheriff's deputies, initially did not know the identity of new defendants, but that once he did have some idea, he delayed in participating in discovery and in filing an amendment. The panel found that the plaintiff was dilatory and hints that where a plaintiff diligently investigates in an effort to identify the proper party, there might be a different result ("[W]e note this action has been plagued by delays... In short the result reached today as to the deputies could—and, indeed, should—have been avoided."). 133 F.3d at 321. As indicated, the panel initially emphasized that the court has discretion in reviewing a request for relation back and granting leave " 'where justice so requires' " " 'as long as the added party had notice within 120 days following the filing of the complaint, **or longer if good cause is shown.'** " *Jacobsen,* 133 F.3d at 319, 320 (emphasis added); *see also Skoczylas,* 961 F.2d at 544–45 (same).

Here, Lead Plaintiff was barred from doing discovery by the PSLRA until the motions to dismiss were resolved. Therefore it first sued the parent Bank Defendants based on what information it had and then, while the motions to dismiss were pending, pursued information reported publicly by the Congressional investigations and the Bankruptcy Examiner. Lead Plaintiff also, within a short time after the Court's December 19, 2002 ruling on the Banks' motions to dismiss, sought permission by letter to amend, as will be discussed.

With respect to the requirements for "relating back" under Rule 15(c) to save the additional parties and additional SDT claims from being time-barred, the Court finds that the claims made against the new Deutsche Bank Entities do arise out of the same, challenged, fraudulent Ponzi scheme as those against Deutsche Bank AG in the First Consolidated Complaint; the Court finds that the SDT claims are also part of that same conduct set forth in the first consolidated pleading, if viewed in the context of the alleged Ponzi scheme. Moreover, the Court infers that the two new entities must have received notice that they would have been sued, were it not for a lack of knowledge by Lead Plaintiff about their corporate identities, because of identity of interest and shared counsel with Deutsche Bank AG.

Nevertheless, unless the Court finds that the corporate confusion and the PSLRA stay constitute "good cause" under *Jacobsen,* it appears that there was no "mistake" as to the additional parties or to the additional SDT claims. By Lead Plaintiff's own admission, the identities of the two new Deutsche Banks were unknown, i.e., Lead Plaintiff lacked knowledge of these two as proper parties, when it filed its First Consolidated Complaint. Lead Plaintiff further claims that it was not put on notice about the tax schemes until May 22, 2002 and filed the amended complaint within the one-year statute of limitations on May 14, 2003. The Court has considered as significant factors that Lead Plaintiff's lack of knowledge was allegedly caused by (1) the complex corporate structure of similarly named entities with identity of interests which the parent company, Deutsche Bank AG, did not unravel for Lead Plaintiff, (2) the absence of discovery to determine legally responsible entities, and (3) the sheer size, complexity, and sophistication of the alleged fraud. 133 F.3d at 321. The Court finds that even if it followed the reasoning of *Berrios,*

1997 WL 777945, *6, and found under all of the circumstances in *Newby,* especially the difficulty of determining which entity was responsible for the alleged wrongdoing, that Lead Plaintiff was not dilatory and that there was good cause to support a Rule 15(c) relation back of the First Amended Consolidated Complaint to filing of the First Consolidated Complaint, nearly all, if not all, the § 10(b) STD claims would still be time-barred by the statute of repose, as discussed. With respect to the § 12(a)(2) claims against Deutsche Securities Inc., allowing the claim against that entity to "relate back" would save it.

Defendants have objected that there was delay on Lead Plaintiff's part, because even after Lead Plaintiff learned of the two new entities, it was dilatory and intentionally did not timely name them until it filed the First Amended Consolidated Complaint in May 2003. In response, however, Lead Plaintiff points out that in the Court's ruling on December 19, 2002, this Court ordered Banking Defendants to file additional appropriate motions to dismiss if they had viable challenges that the wrong entity was being sued. *See, e.g.,* # 1194 at 4 n. 5. As noted, counsel for Lead Plaintiff then wrote a letter to the Court on January 14, 2003, requesting a scheduling conference and specifically asking *inter alia* whether "to address certain bank defendants' arguments, should Lead Plaintiff **amend or supplement to name subsidiaries of the Bank Defendants or file a new complaint with the same claims and adding subsidiaries** [emphasis added by the Court]." Exhibit 1 to # 1575. Numerous motions to dismiss were still pending. On January 27, 2003, the Court issued an order in which it responded to that letter request and stated,

It makes no sense to establish a schedule, including for amendment of pleadings, without knowing all that needs to be done.... Lead Plaintiff also asks whether it should add the subsidiaries of the bank Defendants to an amended or supplemental complaint. The Court indicated in its memorandum and order [# 1194] that if the banks object to being named defendants because a subsidiary or other entity was the real party in interest, they should file appropriate motions. The bank Defendants should do so now, and Lead Plaintiff should file its response as quickly as possible, so that all amendment or supplementation can be efficiently and timely accomplished in one instrument.

# 1238 in *Newby* and # 551 in *Tittle,* at 2–3. Despite this order, some Bank Defendants, including the Deutsche Bank Entities, waited over three months, well after one year [and the limitations period] since Lead Plaintiff had filed its First Consolidated Complaint, to file their motions, while others (J.P. Morgan Chase, Merrill Lynch, Lehman Brothers, and Credit Suisse First Boston) never did so, while Barclays withdrew its motion. Lead Plaintiff claims that it relied on the Bank Defendants' silence and filed its First Amended Consolidated Complaint according to the schedule subsequently established by the Court after it ruled on all the motions to dismiss, so the amendment would by accomplished efficiently and comprehensively, and not piecemeal. Lead Plaintiff argues that Bank Defendants should be equitably estopped from asserting the statute of limitations defense now raised.[41] *Tyler v. Union Oil Co.,* 304 F.3d

---

41. In an argument that does not adequately apply to the claims against the Deutsche Bank Entities for reasons discussed in this memorandum and order, Lead Plaintiff argues that because it sued within the three-year period of repose, equitable estoppel may extend the

379, 391 (5th Cir.2002)(applicability of equitable estoppel turns on "whether the defendant's conduct, innocent or not, reasonably induced the plaintiff not to file suit within the limitations period.").

■ There are two doctrines, among others, that may toll a statute of limitations: equitable tolling and equitable estoppel. Equitable tolling and equitable estoppel are both " 'based primarily on the view that a defendant should not be permitted to escape liability by engaging in misconduct that prevents the plaintiff from filing his or her claim on time.' " *Lekas v. United Airlines, Inc.,* 282 F.3d 296, 301 (4th Cir.2002), *citing English v. Pabst Brewing Co.,* 828 F.2d 1047, 1049 (4th Cir.1987). "Equitable tolling applies where a defendant, by active deception, conceals a cause of action.... And equitable estoppel applies where 'the defendant engages in intentional misconduct to cause the plaintiff to miss the filing deadline' even though the plaintiff knows that it exists." *Id. See also Grace v. Rosenstock,* 228 F.3d 40, 53 (2d Cir.2000)(" 'the doctrine of equitable tolling applies 'where the facts show that the defendant engaged in conduct, often itself fraudulent, that concealed from [the] plaintiff the existence of the cause of action.' ' "), *cert. denied,* 532 U.S. 923, 121 S.Ct. 1362, 149 L.Ed.2d 290 (2001).

Under the law of the Fifth Circuit, " 'Equitable tolling focuses on the plaintiff's excusable ignorance of the [defendant's wrongful conduct]. Equitable estoppel, in contrast, examines the defendant's conduct and the extent to which the plaintiff has been induced to refrain from exercising his rights.' "

*Rhodes v. Guiberson Oil Tools Div.,* 927 F.2d 876, 878 (5th Cir.1991)(quoting *Felty v. Graves–Humphreys Co.,* 785 F.2d 516, 519 (4th Cir.1986)), *cert. denied,* 502 U.S. 868, 112 S.Ct. 198, 116 L.Ed.2d 158 (1991). "Equitable estoppel 'does not hinge on intentional misconduct on the defendant's part. Rather, the issue is whether the defendant's conduct, innocent or not, reasonably induced the plaintiff not to file suit within the limitations period.' " *Tyler v. Union Oil Co. of Cal.,* 304 F.3d 379, 391 (5th Cir.2002), *quoting McGregor v. Louisiana State Univ. Bd. of Supervisors,* 3 F.3d 850, 865–66 (5th Cir.1993). *See also McAllister v. FDIC,* 87 F.3d 762, 767 (5th Cir.1996)("Under the doctrine of equitable estoppel, a defendant is estopped from asserting a limitations defense when its conduct induced or tricked a plaintiff into allowing a filing deadline to pass."); *Barry v. Donnelly,* 781 F.2d 1040, 1042 (4th Cir.1986)(the " 'central premise [of the equitable estoppel doctrine] is that 'one cannot justly or equitably lull his adversary into a false sense of security and thereby cause his adversary to subject his claim to the bar of the statute [of limitations]' and then be permitted to plead the very delay caused by his course of conduct as a defense to the action when brought.' ").

■ Neither the doctrine of equitable estoppel nor that of equitable tolling applies to statutes of repose because "their very purpose is to set an outer limit unaffected by what the plaintiff knows." *Cada v. Baxter Healthcare Corp.,* 920 F.2d 446,

---

time for filing beyond the one-year discovery limitation as long as it was actually filed within the period of repose. *Berning v. A.G. Edwards & Sons, Inc.,* 774 F.Supp. 480, 484 (N.D.Ill.1991), *rev'd on other grounds,* 990

F.2d 272 (7th Cir.1993); *Friedman v. Wheat First Sec. Inc.,* 64 F.Supp.2d 338, 346 n. 7 (S.D.N.Y.1999). It insists that plaintiffs had neither inquiry nor actual notice of the Bank Defendants' conduct as of January 2002.

451 (7th Cir.1990), *cert. denied,* 501 U.S. 1261, 111 S.Ct. 2916, 115 L.Ed.2d 1079 (1991). A number of cases have held that equitable tolling does not extend the statute of repose in federal securities cases. Indeed, with respect to claims under § 10(b) and Rule 10b–5, in *Lampf,* 501 U.S. at 363–64, 111 S.Ct. 2773, the Supreme Court proclaimed, "[T]he equitable tolling doctrine is fundamentally inconsistent with the 1– and 3–year structure [of the statute of limitations].... The 3–year limit is a period of repose inconsistent with tolling.... Because the purpose of the 3–year limitation is clearly to serve as a cutoff, we hold that tolling principles do not apply to that period.". The Supreme Court further made clear that tolling does not apply to the one-year limitations period because by its own terms it "begins after discovery of the facts constituting the violation, making tolling unnecessary." *Id.* at 363, 111 S.Ct. 2773.

Courts have also held that equitable tolling also does not apply to the three-year statute of repose in § 13 for claims under §§ 11 and 12(a)(2)[42] of the 1933 Act. See Thomas Lee Hazen, 1 *Law of Securities Regulation* § 7.10[2] (2d ed. 2004 Supp.)("[T]he courts have almost uniformly agreed that the three year statute of repose in sections 11 and 12 is absolute and thus equitable tolling principles will not be invoked to extend the period further.")(and cases cited therein). Indeed Hazen clearly states,

Section 13 is not only a statute of limitations but also operates as a statute or repose. There is an absolute maximum of three years to prevent stale claims. Actions brought under section 12(a)(2) must be brought within three years of

the sale forming the basis for the alleged violation.

*Id.* at § 7.10[4]. Here, however, under the allegations in the complaint, the § 12(a)(2) claims are not barred by the statute of repose.

Furthermore, while it is clear that equitable tolling does not apply to extend the period of repose, the application of equitable estoppel to securities laws is not clear. The Fourth Circuit has expressed uncertainty: "We have never read the doctrine of equitable estoppel into the federal securities laws." *Chance v. F.N.Wolf & Co., Inc.,* 36 F.3d 1091 (Table), 1994 WL 529901, *5 (4th Cir. Sept.30, 1994), *citing Caviness,* 983 F.2d at 1302. The Seventh Circuit, observing the holding in *Lampf* that

when knowledge or notice is required to start the statute of limitations running, there is no room for equitable tolling," has commented, "But there may still be room in such a case for equitable estoppel. *Katz v. Amos Treat & Co.,* 411 F.2d 1046, 1055 (2d Cir.1969)(Friendly, J.) holds there is room; *Short v. Belleville Shoe Mfg. Co.,* 908 F.2d 1385, 1392 (7th Cir.1990), [ *cert. denied,* 501 U.S. 1250, 111 S.Ct. 2887, 115 L.Ed.2d 1052 (1991),] leaves the question open." Equitable tolling just means that without fault by either party, the plaintiff does not have enough information to sue within the period of limitations, and in the type of statute of limitations that we are discussing the period doesn't start until he has the information, making equitable tolling redundant. But the plaintiff might have the required information-actual knowledge of the violation or inquiry notice, as the case may be-yet be

---

**42.** Claims under § 12(a)(2) must be brought "in no event ... more than three years after the sale." Thus the three-year period of repose for claims under § 12(a)(2) begins to run

at the time of the sale, when the investor executes a subscription agreement and tenders his payment.

thwarted from suing in time by misrepresentations or other actions by the defendant; for example, the defendant may have promised not to plead the statute of limitations.

*Tregenza v. Great American Communications Co.,* 12 F.3d 717, 721 (7th Cir.1993), *cert. denied,* 511 U.S. 1085, 114 S.Ct. 1837, 128 L.Ed.2d 465 (1994).

Some courts have held that the doctrine of equitable estoppel, too, is inapplicable to the three-year period of repose. *See, e.g., Caviness,* 983 F.2d at 1302; *Webb v. United States,* 66 F.3d 691, 700 (4th Cir.1995), *cert. denied,* 519 U.S. 1148, 117 S.Ct. 1079, 137 L.Ed.2d 215 (1997); *Anixter v. Home–Stake Prod. Co.,* 939 F.2d 1420, 1435–36 (10th Cir.), *amended on denial of rehearing,* 947 F.2d 897 (10th Cir.1991), *judgment vacated on other grounds sub nom. Dennler v. Trippet,* 503 U.S. 978, 112 S.Ct. 1658, 118 L.Ed.2d 382 (1992); *S.E.C. v. Seaboard Corp.,* 677 F.2d 1301, 1308 (9th Cir.1982)(statutory language reflects that Congress intended the three-year bar of § 13 to be absolute and equitable principles do not apply to toll it); *Summer v. Land & Leisure, Inc.,* 664 F.2d 965, 968 (5th Cir.1981)(agreeing with majority rule and holding that "normal tolling rules are not applicable to toll the three-year period"), *cert. denied,* 458 U.S. 1106, 102 S.Ct. 3485, 73 L.Ed.2d 1367 (1982); *Friedman v. Wheat First Securities, Inc.,* 64 F.Supp.2d 338 (S.D.N.Y.1999); *Del Sontro v. Cendant Corp.,* 223 F.Supp.2d 563, 572–74 (D.N.J. 2002).

Others have focused on its applicability to the one-year limitations period, since under equitable estoppel the plaintiff knows of his claim and discovery is not an issue. Some courts have concluded that equitable estoppel may apply to extend that one-year period, but may not extend limitations by more than the two years' grace period provided by the three-year

statute of repose. *Short v. Belleville Shoe Mfg.,* 908 F.2d 1385, 1391 (7th Cir.1990), *cert. denied,* 501 U.S. 1250, 111 S.Ct. 2887, 115 L.Ed.2d 1052 (1991); *Berning v. A.G. Edwards & Sons, Inc.,* 774 F.Supp. 480, 484 (N.D. Ill.1991)("[I]t is possible for equitable estoppel to extend the time for filing suit beyond the one-year discovery limitation to the time that they actually filed suit within the three-year repose period."), *rev'd on other grounds,* 990 F.2d 272 (7th Cir.1993); *Friedman v. Wheat First Securities, Inc.,* 64 F.Supp.2d at 346–47 & n. 7. ("This Court believes that the equitable estoppel doctrine as applied to the one-year from discovery period is not inconsistent with *Lampf* as long as the claim is brought within the three-year period of repose," but finding no injustice to support its application in that case). This Court finds such an approach persuasive.

In *Newby,* Lead Plaintiff is requesting application of equitable estoppel on the grounds that Defendants failed to file motions to dismiss raising the issue of wrongly named entities as ordered by the Court. This argument is not fully convincing because it is the plaintiff's burden to file within the limitations period and, from the record, it appears Lead Plaintiff could have done so. Nevertheless the circumstances here are distinguishable from the usual situation giving rise to a request for equitable estoppel. Not only did Lead Plaintiff rely on Defendants' failure to file such motions, but, perhaps more significantly, it relied on the Court's determination that in the interests of efficiency and avoidance of repeated amendments, the complaint should not be amended until all the original motions to dismiss were all resolved and the Court had identified all pleading deficiencies that required supplementation. In a litigation this size and with the complexity and variety of the issues raised, substantial delay was inevit-

able. Moreover, when the Court responded to Lead Plaintiff's timely letter asking about amendment of numerous issues, it was not thinking about the statute of limitations problem when it opined that in the interests of efficiency of time and cost, amendment of the complaint should be deferred until all the motions to dismiss were resolved and should be effected in a single instrument. In view of all these circumstances and pursuant to Federal Rule of Civil Procedure 15(a)("leave [to amend] shall be freely granted when justice so requires"), the Court construes that letter of January 14, 2003 as a timely motion for leave to amend and finds that January 14, 2003 constitutes the date that the Amended Consolidated Complaint was filed, and was timely filed, for purposes of the statute of limitations. *Northwestern National Ins. Co. v. Alberts,* 769 F.Supp. 498, 510 (S.D.N.Y.1991)("When a plaintiff seeks to add a new defendant in an existing action, the date of the filing of the motion to amend constitutes the date the action was commenced for statute of limitations purposes"), *quoted for that proposition in Rothman v. Gregor,* 220 F.3d 81, 96 (2d Cir.2000). *See also* J. William Hicks, 17 Civil Liabilities: Enforcement and Litigation under the 1933 Act § 6:152, *Statute of Limitation—Determining When Diligence is Needed—Stating the Problem* (2001, updated Oct. 2003); William M. Prifti, "Public and Private Offerings", 24 Securities Pub. & Priv. § 12:16 at *7 (Oct.2003).

Nevertheless, as indicated, the problem here is that Lead Plaintiff's § 10(b) tax scheme allegations, which are essential to avoiding a 12(b)(6) dismissal for failure to state a claim, are nearly all time-barred by the three-year statute of repose. As noted, only the Valhalla Project appears to be within the three-year statute of repose. Allegations based on a single tax scheme, which was not even detailed in the com-

plaint, are not sufficient to sustain a claim of a primary violation of § 10(b). Accordingly, Lead Plaintiff's § 10(b), and derivative § 20(a), claims against Deutsche Bank Entities must be dismissed.

**2. 1933 Act's Section 12(a)(2) and § 15 Claims**

**(a) Standing**

█ To state a claim under § 12(a)(2), a plaintiff must have individual standing. *In re Taxable Mun. Bond Sec. Litig.,* 51 F.3d 518, 522 (5th Cir.1995). Defendants have urged that no plaintiff has purchased any of the securities at issue.

█ As noted, ICERS, which recently intervened, has standing to sue under § 12(a)(2) for its claims relating to its purchase in the July 12, 2001 offering of Marlin Water Trust II notes, for which Deutsche Bank served as underwriter and qualifies as a statutory "seller" (a "person who actually passes title to the buyer, or 'the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner,' *e.g.,* a broker"). *Rosenzweig v. Azurix Corp.,* 332 F.3d 854, 871 (5th Cir.2003). Moreover, as indicated in # 1999, Lead Plaintiff may currently assert such a § 12(a)(2) claim on behalf of purchasers of the Foreign Debt Securities, but the class representative(s) must be actual purchasers from their immediate sellers. If the claims are timely brought, if the notes were bought in a public placement, and if a class is certified and a class member is qualified, claims may be pursued against the other three types of notes sold by the Deutsche Bank Entities.

**(b) Private or Public Offerings**

There is no dispute that the Four note resales on which Lead Plaintiff's § 12(a)(2)

claims are based were exempt from the registration requirements of Section 5 of the 1933 Act.

█ Section 12 applies only to public offerings and not to private transactions. *Gustafson v. Alloyd Co.*, 513 U.S. 561, 584, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995)(5–4); *Lewis v. Fresne*, 252 F.3d 352, 357 (5th Cir.2001). Section 12(a)(2) creates a cause of action for written misrepresentations in a "prospectus," [43] i.e., a crucial term of art which the majority of the Supreme Court has ruled "refers to a document soliciting the public to acquire securities," which "relates to public offerings by issuers and their controlling shareholders," and which "must include the information contained in the registration statements (emphasis added)." 513 U.S. at 569, 574, 576, 579, 584, 115 S.Ct. 1061. The Supreme Court was emphatic:

Section 10 does not provide that some prospectuses must contain the information contained in the registration state-

ment. Save for the explicit and well-defined exemptions for securities listed under § 3, see 15 U.S.C. § 77c (exempting certain classes of securities from the coverage of the Act), its mandate is unqualified: "[A] prospectus ... shall contain the information contained in the registration statement."

513 U.S. at 569, 115 S.Ct. 1061. It continued,

An examination of § 10 reveals that, whatever else "prospectus" may mean, the term is confined to a document that, absent an overriding exemption, must include the "information contained in the registration statement." By and large, only public offerings by an issuer of a security, or by controlling shareholders of an issuer, require the preparation and filing of registration statements. See 15 U.S.C. §§ 77d, 77e, 77b(11). It follows, we conclude, that a prospectus under § 10 is confined to documents related to

---

**43.** Section 2(a)(10) of the 1933 Act, 15 U.S.C. § 77b(a)(10), broadly defines "prospectus" to mean "any prospectus, notice, circular, advertisement, letter or communication, written or by radio or television, which offers any security for sale or confirms the sale of any security." The Supreme Court observed that "the list refers to documents of wide dissemination" and "public communication," "not face-to-face or telephonic communications." *Gustafson*, 513 U.S. at 575, 115 S.Ct. 1061. In construing § 12, the Supreme Court turned to Section 10 of the Securities Act, 15 U.S.C. § 77j(a), which defined a prospectus as including "information in the registration statement," "absent an overriding exemption." *Gustafson*, 513 U.S. at 569, 115 S.Ct. 1061.

Section 10 exempts from the registration requirements set out in § 5 certain securities issued pursuant to § 3 (e.g., exempting *inter alia* securities issued or guaranteed by the United States government and its agencies, state and local governments and banks) and transactions pursuant to § 4 of the Securities Act. While § 5, 15 U.S.C. § 77e, mandates

that a seller file a registration statement as to any security that it sells or offers for sale, sections 3 and 4 list exceptions to that registration requirement. Relevant here, a private placement, i.e., "transactions by an issuer not involving any public offering" but sold to a limited number of qualified investors, is exempted from registration requirements under § 4(2), 15 U.S.C. § 77d(2).

One commentator has pointed out that "prospectus" is defined so broadly that it includes "virtually any writing that might be construed to offer a security for sale." David A. Leipton, 15 Broker–Dealer Reg. § 3:52 (West 2004; Database Updated Oct. 2003). He gives an example where the SEC found that a business card with a note written on it, "Phone me as soon as possible as my allotment is almost complete on this issue," enclosed in a mailing along with a preliminary prospectus and a cover letter to customers during the preeffective period, was a prospectus because it "solicited an offer" but failed to meet the requirements of Section 5(b) for prospectuses. *Id.*

public offerings by an issuer or its controlling shareholders.

*Id.*[44] Thus unless a securities transaction is exempt from registration requirements by statute, rule, regulation, or by judicial ruling,[45] it must be registered with the SEC in accordance with § 5 before any use may be made of any means of interstate commerce or the mails to sell or offer to sell securities. Thus a § 12(a)(2) claim may be asserted only by purchasers of stock in a public offering pursuant to a prospectus containing material misrepresentations or omissions. *Gustafson,* 513 U.S. at 574, 576, 584, 115 S.Ct. 1061 (holding that § 12(a)(2) does not extend to a private resale contract that is not held out to the public).[46]

The phrase, "public offering," is not defined in § 4(2) of the Securities Act of 1933, 15 U.S.C. § 77d(2) (exempting from § 5's registration requirements any transactions by an issuer not involving a public offering). In the leading case on the issue, the Supreme Court defined the scope of the private offering exemption by examining the legislative purpose of the Act, i.e., to protect investors by requiring full disclosure of information that was material to making informed investment decisions; therefore "since exempt transactions are those as to which 'there is not practical need for . . . (the bill's) application,'" the applicability of the § 4(2) private placement exemption should rest upon "whether the particular class of investors affected need the protection of the Act." *SEC v. Ralston Purina Co.,* 346 U.S. 119, 124, 73 S.Ct. 981, 97 L.Ed. 1494 (1953). "An offering to those who are shown to be able to fend for themselves is a transaction 'not involving any public offering,'" i.e., a private transaction. *Id.* at 124–25, 73 S.Ct. 981, *quoted for that proposition in Woolf v. S.D. Cohn & Co.,* 515 F.2d 591, 608 (5th Cir.1975), *vacated on other grounds,* 426 U.S. 944, 96 S.Ct. 3161, 49 L.Ed.2d 1181 (1976). Therefore the exemption issue depends on the knowledge of the potential investors. *Id.* at 126–27, 73 S.Ct. 981 ("the exemption turns on the knowledge of the offerees").[47] Phrased in another way, "the governing fact is whether the persons to whom the offering is made are in such a position with respect to the issuer that they either actually have such information as a registration would have disclosed, or have access to such information." *Gilli-*

---

44. In *Gustafson,* 513 U.S. at 570, 115 S.Ct. 1061, the Supreme Court looked at the 1933 Act "as a symmetrical and coherent regulatory scheme, one in which the operative words have a consistent meaning throughout"; it concluded that "the term 'prospectus' must have the same meaning under § 10 and 12" and that § 10 provides "guidance and instruction for giving the term a consistent meaning throughout the Act."

45. For example, as indicated, section 4(2) is a statutory exemption from the registration requirements of § 5 of the Securities Act of 1933 for "transactions by an issuer not involving any public offering." Rule 144A establishes a non-exclusive safe harbor exemption for secondary sales of certain kinds of unregistered securities, previously sold pursuant to an exemption, to QIBs, while Regula-

tion S provides that only offers and sales of securities made in the United States, but not offshore transactions, are subject to the registration requirements.

46. In *Gustafson,* the Supreme Court found that a contract that accompanied the sale of the securities was not required to contain the information contained in a registration statement," and therefore was not a "prospectus." 513 U.S. at 569, 115 S.Ct. 1061.

47. The Supreme Court stated in *Ralston Purina,* 346 U.S. at 126–27, 73 S.Ct. 981, "[O]nce it is seen that the exemption question turns on the knowledge of the offerees, the [issuer's] motives, laudable though they may be, fade into irrelevance. The focus of the inquiry should be on the need of the offerees for the protections afforded by registration."

*gan, Will & Co. v. SEC,* 267 F.2d 461, 466 (2d Cir.1959)(*citing Ralston Purina,* 346 U.S. at 125–27, 73 S.Ct. 981), *cert. denied,* 361 U.S. 896, 80 S.Ct. 200, 4 L.Ed.2d 152 (1959).

■ The defendant bears the burden of proving a private-offering-exemption affirmative defense. *SEC v. Ralston Purina Co.,* 346 U.S. 119, 126, 73 S.Ct. 981, 97 L.Ed. 1494 (1953)("Keeping in mind the broadly remedial purposes of federal securities legislation, imposition of the burden of proof on an issuer who would plead the exemption seems to us fair and reasonable."); *Strahan v. Pedroni,* 387 F.2d 730, 732 (5th Cir.1967)("[T]he number, amount and manner of the offering ... and ... whether the particular persons affected stand in need of the protection of the Act ... must be proved affirmatively by the defense before the 'public offering' exception becomes operative.").

■ What constitutes a public offering turns on a number of factors and requires a fact-specific analysis on a case by case basis. *Hill York Corp. v. American International Franchises, Inc.,* 448 F.2d 680, 687 (5th Cir.1971); *Mary S. Krech Trust v. Lakes Apartments,* 642 F.2d 98, 101 (5th Cir.1981). The Fifth Circuit has identified the following factors as relevant to the analysis: "1. The number of offerees and their relationship to each other and to the issuer.... 2. The number of units offered.... 3. The size of the offering.... [and] 4. The manner of the offering." *Hill York Corp.,* 448 F.2d at 687–89. Nevertheless, the Fifth Circuit admonishes,

> Consideration of these factors need not exhaust the inquiry, nor is one factor's weighing heavily in favor of the private status of the offering sufficient to ensure the availability of the exemption. Rather these factors serve as guideposts to the court in attempting to determine whether subjecting the offering to registration requirements would further the purposes of the 1933 Act.

*Doran v. Petroleum Management Corp.,* 545 F.2d 893, 900 (5th Cir.1977); *see also Mary S. Krech Trust,* 642 F.2d at 101 (these considerations "are not litmus paper tests but guidelines").

Regarding the first factor, the Fifth Circuit explained,

> "No particular numbers are prescribed. Anything from two to infinity may serve: perhaps even one ...." Obviously, however, the more offerees, the more likelihood that the offering is public. The relationship between the offerees and the issuer is most significant. If the offerees know the issuer and have special knowledge as to its business affairs, such as high executive officers of the issuer would possess, then the offering is apt to be private.... Also to be considered is the relationship between the offerees and their knowledge of each other. For example, if the offering groups is being made to a diverse and unrelated group, i.e., lawyers, grocers, plumbers, etc., then the offering would have the appearance of being public; but an offering to a select group of high executive officers of the issuer who know each other and of course have similar interests and knowledge of the offering would likely be characterized as a private offering. [footnotes omitted]

*Hill York Corp.,* 448 F.2d at 688, *citing Ralston Purina,* 346 U.S. 119, 73 S.Ct. 981. Nevertheless, "to be public, an offer need not be open to the whole world." *Ralston Purina Co.,* 346 U.S. at 123, 73 S.Ct. 981.

Regarding the second factor, the number of units offered, "there is no fixed magic number. Of course, the smaller the number of units offered, the greater the likelihood the offering will be considered

private." *Hill York Corp.*, 448 F.2d at 689. Similarly, with respect to the third factor, the size of the offering, the smaller it is, the more likely it is to be private. *Id.*

Moreover, relating to the fourth factor, the manner of offering, the Fifth Circuit has indicated, "A private offering is more likely to arise when the offer is made directly to the offerees rather than through the facilities of public distribution such as investment bankers or the securities exchanges. In addition, public advertising is incompatible with the claim of private offering." *Id.*

Finally, the "ultimate test" remains "whether 'the particular class of persons affected need the protection of the Act.'" *Id.* Because the 1933 Act is remedial legislation, it is entitled to a broad construction, while the exemptions to registration requirements and prospectuses must be narrowly construed. *Id.* Thus the defendant must show that each offeree had the same information that was available in the registration statement or had access to that information. *Swenson v. Engelstad*, 626 F.2d 421, 425–26 (5th Cir.1980). Evidence of the offerees' sophistication, and of access to information in · the registration statement, may help to show a private offer, but is not dispositive. *Id.* at 426, n. 12. *See generally* Elizabeth T. Tsai, Annotation, *What Constitutes A "Public Offering" Within Meaning of § 4(2) of Securities Act of 1933 (15 U.S.C.A. § 77D(2)), Exempting From Its Registration and Prospectus Requirements Transactions by an Issuer Not Involving "Any Public offering"*, 6 A.L.R. Fed. 536, § 2 (Lawyers Co-operative Publish Co./Bancroft Whitney Co.2004).

■ As noted previously, relying on *State of Alaska Dept. of Revenue v. Ebbers (In re Worldcom, Inc. Sec. Litig.)*, 294 F.Supp.2d 431 (S.D.N.Y.2002), Deutsche Bank Entities argue that the offering memoranda from each of the four note resales involved in Lead Plaintiff's § 12(a)(2) claims against the Deutsche Bank Entities expressly and dispositively indicate on their face that they were made pursuant to Rule 144A and Regulation S, and therefore are not prospectuses, but are private offerings, not actionable under § 12(a)(2). # 1621, Exhibits 3–6.

The Court observes that a number of features of the *Newby* offering memoranda are similar to those in *State of Alaska*. For example, the offering memorandum for Osprey Trust Osprey I, Inc. 8.31% Senior Secured Notes due 2003, Ex. 3 to # 1621, which is virtually identical to the others, states in relevant part,

**THE SENIOR NOTES HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED ... OR ANY STATE SECURITIES LAWS AND MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS. ACCORDINGLY, THE SENIOR NOTES ARE BEING OFFERED HEREBY ONLY (A) TO "QUALIFIED INSTITUTIONAL BUYERS" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT ... IN RELIANCE ON THE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT PROVIDED BY RULE 144A) AND (B) OUTSIDE THE UNITED STATES TO CERTAIN PERSONS IN RELIANCE UPON REGULATION S UNDER THE SECURITIES ACT .... PROSPECTIVE PURCHASERS ARE HEREBY NOTIFIED THAT**

SELLERS OF THE SENIOR NOTES MAY BE RELYING ON THE EXEMPTIONS FROM THE PROVISIONS OF SECTION 5 OF THE SECURITIES ACT PROVIDED BY RULE 144A AND REGULATION S...

The same offering memorandum has other provisions suggesting that it is a private offering: it states that it has not been registered with the SEC, that it is "personal to each offeree to whom it has been delivered" and "does not constitute an offer to any other person or to the public generally," that distribution or disclosure of any of the parts of the memorandum to any other person not an advisor to the original offeree is "unauthorized," that the recipient is "to make no photocopies of this memorandum," and, if he chooses not to purchase the notes, that he is to return the memorandum to the firm distributing it. On the bottom of each page is the phrase, "Confidential Treatment Requested ...."

Furthermore, Rule 144A, 17 C.F.R. § 230.144A, expressly states that offerings to Qualified Institutional Investors ("QIBs") under the rule's provisions "shall not be deemed to have been offered to the public." As one court explains,

> Rule 144A creates a safe harbor from the registration requirements of the Securities Act for certain institutional investors known as Qualified Institutional Buyers ("QIB's")—institutions that own and invest on a discretionary basis at least $100 million. The SEC instituted the rule because, while the Securities Act was "remedial legislation designed to protect ... unsophisticated, individual investors ...," certain institutions can fend for themselves and therefore, offers and sale to such institutions does not involve a public offering[.]"

*In re Hayes Lemmerz Intern., Inc.*, 271 F.Supp.2d 1007, 1026 (E.D.Mich.2003). Based on the express provision of Rule 144A that "offerings to QIBs are private" and *Gustafson*'s limitation of § 12(a)(2) liability to public offerings, the *Hayes Lemmerz* court granted the defendant's motion to dismiss the § 12(a)(2) claims. *Id.* at 1029. *See also In re Safety–Kleen Corp.*, No. C/A 3:00–1145–17, 2002 WL 32349819, *2 (D.S.C. Mar.27, 2002)(holding that because the securities were only sold to sophisticated QIBs and the exchange transaction was open only to QIBs who had previously purchased unregistered bonds, under the express terms of Rule 144A there was no public offering in the case before it and therefore no liability under § 12(a)(2)).

Regulation S, adopted in SEC Release No. 33–6863 (April 23, 1990), is a non-statutory exemption for securities offered and sold outside the United States from the registration requirements under § 5 of the 1933 Act. 17 C.F.R. § 230.901 (2004). Because a memorandum accompanying a Regulation S offering is not required to contain information contained in a registration, it may not be a "prospectus" and thus might not support a claim under Section 12.

Nevertheless, the law is not clear as to whether an offering memorandum that is not exempt under § 4(2), but that falls under Rule 144A or Regulation S is necessarily a private offering. A district court in the Southern District of New York recently refused to extend the reasoning of *Gustafson* to Regulation S offerings; it concluded that even though registration is not required for such offerings, because Regulation S offerings are not exempted under § 3 or § 4 of the Securities Act of 1933, 15 U.S.C. § 77c, they are subject to liability under § 12(a)(2) if they are public offerings. *Sloane Overseas Fund, Ltd. v. Sapiens Intern. Corp., N.V.*, 941 F.Supp. 1369, 1376 & n. 11 (S.D.N.Y.1996). In *Sloane Overseas*, the district court found

that wide distribution of the Offering Circular made the offering public and therefore subject to § 12(a)(2) liability. *See also* Edward Brodsky and M. Patricia Adamski, *Law of Corporate Officers and Directors: Rights, Duties and Liabilities,* Ch. 11 "Scope and Elements of Section 12(2)," LCODR § 11:26 (2003 update)(Although it is clear under *Gustafson* that § 12(2) "does not apply to exempt private placements," it "would however appear to apply to a purported private placement that is found to be a nonexempt public offering."), *citing* Weiss, *Securities Act Section 12(2) After Gustafson v. Alloyd Co.: What Questions Remain?,* 50 Bus. Law 1209, 1219–25 (1995)("arguing that although § 12(2) does not apply to exempt private placements under § 4(2), regulation D transactions not ·exempt under § 4(2) [e.g., Regulations S and Rule 144A] may still be subject to § 12(2) liability."), and *Sloane Overseas Fund,* 941 F.Supp. 1369.

Emphasizing that under Fifth Circuit law the question of whether an offering is private is a question of fact that must be resolved in light of the facts and circumstances of each case, *Swenson,* 626 F.2d at 425, Lead Plaintiff, citing the ruling in *Lewis,* 252 F.3d at 358 (size of the offering and the number of offerees" are two of the criteria for determining if a transaction in public), argues that the First Amended Consolidated Complaint alleges facts that show that the offerings were public. It points out that the First Amended Consolidated Complaint asserts that Defendants sold billions of dollars of Foreign Debt Securities to plaintiffs or Class members between September 1999 and July 2001 (¶¶ 641.1–2, 1016.4); that two of the offerings exceeded $125 million (¶ 641.2); that

the smallest offerings were more than $125 million (*Id.*), with the smallest offering underwritten by Deutsche Bank was for $500 million [48]; and that the offerings were widely targeted for distribution to citizens/subjects/residents of the United States, United Kingdom, the European Union, respectively, as reflected in the various monetary denominations of the securities in dollars, pounds, and euros (¶¶ 641.2, 1016.4). *See Sloane,* 941 F.Supp. at 1376 ("the wide distribution of the Offering Circular made Sapiens' Note offering public" for purposes of § 12(a)(2)). The Foreign Debt Securities were also issued for public listing and public trading on the Luxembourg Stock Exchange (¶¶ 641.1, 641.3, 641.7, 641.12, 641.17, 641.21, 641.25, 641.29, 641.33, 641.37), although the amended complaint alleges that plaintiffs purchased them from Defendants, not through the Exchange. It contends that Bank Defendants have failed to demonstrate that there are any allegations in the amended complaint that establish that the offering was private. *Flake v. Hoskins,* 55 F.Supp.2d 1196, 1229 (D.Kan.1999)("Defendants do not cite any allegations in the complaint which conclusively establish that the offering was merely private.").

With respect to the rationale of *State of Alaska,* this Court is aware of other decisions, pursuant to *Gustafson,* dismissing claims under § 12(a)(2) where the court ruled that the offering memorandum was on its face not a "prospectus," but a private placement memorandum for purposes of § 12(a)(2) claims. Nevertheless nearly all considered other factors or circumstances in reaching their decision, especially whether the plaintiffs have nevertheless claimed in their pleadings that the offering was public, recognizing that at the 12(b)(6)

---

**48.** *SEC v. Murphy,* 626 F.2d 633, 646 (9th Cir.1980)("Without question, [a sale of $7.5 million in securities] is a sizeable offering,

and it is one that we are inclined to consider as public ....").

stage of litigation a court must accept well pleaded facts by the plaintiffs as true. *See, e.g., Vannest v. Sage, Rutty & Co., Inc.,* 960 F.Supp. 651, 654 (W.D.N.Y.1997)(offering memorandum expressly stated the offering was private *and* plaintiffs waited six years before claiming the offering was not truly private); *Fisk v. SuperAnnuities, Inc.,* 927 F.Supp. 718, 730 (S.D.N.Y.1996)(dismissal at Rule 12(b)(6) stage was premature where, although the offering memorandum stated the offering was private, plaintiff contended that the information he had obtained thus far challenged "whether the offering was a *bona fide* private placement."); *In re JWP Inc. Sec. Litig.,* 928 F.Supp. 1239, 1259 (S.D.N.Y.1996)(plaintiff conceded the offering was made by a private placement memorandum, but the court noted "had plaintiff alleged the offering was public," it would be premature for the court to assess the weight of factors set out in *United States v. Arutunoff,* 1 F.3d 1112, 1118 (10th Cir.1993)(number of offerees, sophistication of offerees and their access to the kind of information that would be in the registration statement, and the manner of the offering), *cert. denied sub nom. DeVries v. United States,* 510 U.S. 1017, 114 S.Ct. 616, 126 L.Ed.2d 580 (1993) (to decide whether the offering was public or private); *ESI Montgomery County, Inc. v. Montenay International Corp.,* 899 F.Supp. 1061, 1064 (S.D.N.Y.1995)(same); *Kainos Laboratories, Inc. v. Beacon Diagnostics, Inc.,* No. C–97–4618 MHP), 1998 WL 2016634, *4–5 (N.D.Cal.1998)(analogizing situation to that in *Vannest* and dismissing § 12(a)(2) claims where offering memorandum indicated it was a private placement and the complaint did not sufficiently allege that the stock sale was part of a public offering). Indeed in *Lewis v. Fresne,* 252 F.3d 352, 357–58 (5th Cir.2001) the panel dismissed the plaintiff's § 12(a)(2) claims only after it determined that the evidence respecting Lewis' conduct and the complaint's allegations regarding two of the criteria for determining whether a transaction was public, i.e., the size of the offering and the number of offerees, demonstrated that the transaction at issue was private.

Furthermore, several courts have expressly held that such fact-intensive inquiries are not appropriate for review under a motion to dismiss, where a court, assuming the plaintiff's allegations are true, should find they are adequate to establish a public offering. *See, e.g., Flake v. Hoskins,* 55 F.Supp.2d 1196, 1229 (D.Kan.1999); *ESI Montgomery County, Inc. v. Montenay Int'l Corp.,* 899 F.Supp. 1061, 1065 (S.D.N.Y.1995). Indeed, the decisions in *Vannest,* 960 F.Supp. 651, and *In re JWP,* 928 F.Supp. at 1243, were issued at the summary judgment stage of litigation. Moreover in both, as well as in *ESI,* 899 F.Supp. at 1065, the plaintiffs in essence conceded that the offerings were private.

This Court, viewing the allegations in the First Amended Consolidated Complaint in a light most favorable to Lead Plaintiff, cannot conclude that there is no chance that it might be able to prove its claim that these were public offerings. Clearly discovery and submission of evidence are essential before such a determination can be made.

## III. ORDER

Accordingly, for the reasons indicated above, the Court

ORDERS that Merrill Lynch's motion for clarification (# 1556) is GRANTED; the discovery stay under the PSLRA was in effect as to Merrill Lynch and Deutsche Bank until issuance of this order, but is now lifted. The Court further

ORDERS that Merrill Lynch's motion to dismiss (# 1499) is DENIED. Finally, the Court

ORDERS that the Deutsche Bank Entities' motion to dismiss (# 1620) is GRANTED as to § 10(b) and § 20(a) claims under the Exchange Act based on the SDTs against all three entities, but DENIED as to claims grounded in § 12(a)(2) and § 15 of the 1933 Act against Deutsche Bank AG and Deutsche Bank Securities, Inc. Thus Deutsche Bank Trust Company Americas is DISMISSED from this action.